STATE OF NORTH CAROLINA v. CARLOS CANADY

No. 115A00

(Filed 7 March 2002)

## 1. Evidence— hearsay—testimony of detective—information received from prison inmate told by another inmate

The trial court erred in a double first-degree murder case by allowing hearsay testimony from a detective concerning information he received from a prison inmate that the inmate was told by

another prison inmate about the murders, including the fact that defendant and another young man killed the victims, because: (1) the detective's testimony provided more than a mere explanation of his subsequent actions when the detective provided details contained in the prison inmate's statement such as how defendant broke into the victim's house through a window, that defendant went into the bathroom with a rifle and shot one of the victims, and that defendant fled with a money bag; (2) the State's closing argument reveals that the State relied on the detective's testimony as substantive evidence of the details of the murder and to imply defendant had given a detailed confession of his alleged crimes; and (3) despite the trial court's limiting instruction, the detective's testimony went so far beyond the confines of this instruction that the jury could not reasonably have restricted its attention to any nonhearsay elements in the detective's testimony.

**2. Evidence— denial of opportunity to cross-examine— impeachment—motive**

The trial court erred in a double first-degree murder case by denying defendant the opportunity to fully cross-examine a detective concerning portions of his testimony concerning information he received from a prison inmate that the inmate was told by another prison inmate about the murders, including the fact that defendant and another young man killed the victims, because: (1) defendant's proposed questions were designed to impeach the segment of the detective's testimony that provided details of defendant's alleged crimes, and once the trial court permitted the detective to testify on direct examination to these details, the trial court should have permitted defendant to present any evidence that would have been proper to impeach the two prison inmates if either of them had testified; and (2) defendant's proposed questions also appear proper to determine whether the detective's subsequent investigation included an examination of the prison inmate's motive for implicating defendant and the inmate's other potential sources of information.

**3. Discovery— names of informants—information someone other than defendant committed offenses**

The trial court erred in a double first-degree murder case by failing to require the State to disclose names of informants with material exculpatory information that someone other than defendant committed the offenses, because: (1) defendant could

STATE v. CANADY

[355 N.C. 242 (2002)]

not effectively use the information at trial; (2) defendant needed access to these individuals to interview them and develop leads; and (3) there is a reasonable probability that if defendant had access to informants who had names of others involved in the murders, such information could have swayed the jury to reach a different outcome.

**4. Constitutional Law— right to confrontation—expert testimony about murder weapon—failure to allow opportunity to examine expert's testing procedure and data**

The trial court erred in a double first-degree murder case by allowing an expert to testify about his testing of what appeared to be the murder weapon without allowing defendant an opportunity to examine the expert's testing procedure and data, because: (1) a defendant has a constitutional right to confront his accusers and witnesses against him, including the right to prepare and present a defense; and (2) defendant was not provided with the right to present a full defense.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Hudson, J., on 22 November 1999 in Superior Court, Robeson County, upon a jury verdict finding defendant guilty of first-degree murder. On 28 March 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 11 December 2001.

*Roy Cooper, Attorney General, by Joan M. Cunningham, Assistant Attorney General, and William P. Hart, Special Deputy Attorney General, for the State.*

*Center for Death Penalty Litigation, by Jonathan E. Broun, for defendant-appellant.*

WAINWRIGHT, Justice.

On 3 March 1997, Carlos Canady (defendant) was indicted for the murders of Hiram and Michael Burns, one count of second-degree burglary, one count of robbery with a dangerous weapon, and one count of conspiracy to commit armed robbery. Defendant was tried capitally, and the jury found him guilty of first-degree murder of

Hiram Burns on a theory of lying in wait and guilty of first-degree murder of Michael Burns under the felony murder rule. Defendant was also found guilty of the other charges. In the death of Hiram Burns, the jury recommended and the trial judge sentenced defendant to death. In the death of Michael Burns, the jury recommended and the trial judge sentenced defendant to life imprisonment. The jury also found defendant guilty of the remaining charges, and the trial court sentenced defendant to consecutive terms of imprisonment.

Evidence presented at trial showed Hiram Burns (Hiram) and his son, Michael Burns (Michael), lived in Rennert, North Carolina. Michael had severe brain damage. On Sunday, 13 December 1992, the victims' dead bodies were found in their home. Each had died from gunshot wounds.

In 1996, an inmate at Pender County Correctional Unit told police defendant and a young man, eventually identified as Lacoma Locklear (Lacoma), were involved in the murders. Lacoma, who was only fourteen years old in 1992, testified that on 12 December 1992 he and defendant went to Rennert because defendant said he knew a man who ran a store there and they could rob the man. Lacoma said he and defendant entered the man's house through a window. Defendant was carrying a rifle. A few minutes later, a man entered the house, and Lacoma heard three shots from the bathroom where defendant was. The man fell to the floor, and Lacoma heard two more shots. Lacoma stated that after the shooting defendant grabbed a brown paper bag from the man on the floor, and Lacoma and defendant ran out the front door. The bag fell and tore, and Lacoma could see it contained money. Lacoma stated defendant threw the rifle off the Kirby Bridge. Investigators subsequently found a Universal .30-caliber Carbine semiautomatic rifle near the Kirby Bridge in the Lumber River at the point Lacoma indicated.

Defendant presented evidence that Lacoma told several people he and defendant did not kill the Burnses. Lacoma said, among other things, "Me and Carlos ain't killed nobody," and "We hadn't done a thing." Two witnesses, Steve Jones (Steve) and Paladin Jones (Paladin), testified Billy Ray Jones (Billy Ray) told them he killed the Burnses. Steve testified Billy Ray told him details of the crime including who helped him, how they got in the window, and that Hiram had a money bag in his hands when he entered the house. Paladin testified that he heard Billy Ray describe details of the murders and that Billy Ray went to Paladin's house the night before the murders took

place to borrow a gun which Paladin refused to lend. On rebuttal, the State called Billy Ray, who denied committing the murders.

Defendant assigns error to several of the trial court's rulings. We agree with defendant that the trial court's rulings on at least four specific issues were erroneous. Although none of the trial court's errors, when considered in isolation, were necessarily sufficiently prejudicial to require a new trial, the cumulative effect of the errors created sufficient prejudice to deny defendant a fair trial. Accordingly, a new trial is required.

[1] First, defendant assigns error to the trial court's allowance of testimony from Detective James Carter concerning information he received from a prison inmate about the murders. Carter testified his investigation included an interview with prison inmate George Blackwell. According to Carter, Blackwell said another inmate, Woody Butler, told Blackwell defendant and another young man killed the victims. Defendant argued at trial this testimony constituted inadmissible hearsay because it was offered for "the truth of the matter asserted." The State argued the testimony was not offered for its truth, but to show the witness's conduct after he received the information. The trial court overruled defendant's objection and instructed the jury as follows:

> COURT: All right, members of the jury, this witness is going to relate to you conversations that he had with another person.

> The State is not offering the substance of that conversation for the truthfulness of what the other person asserted, but to explain to you what this witness, Mr. Carter, did as a result of receiving that information.

> You should consider it for that reason, and that reason, only.

Following the trial court's instruction, Carter testified before the jury under direct examination by the State as follows:

> Q. What, if anything, did George Blackwell tell you when you met with him at the Pender Correctional Institute?

> Ms. BIGGS [defense counsel]: Objection, Judge.

> COURT: Overruled.

> . . . .

> A. Okay. George told me—

Ms. BIGGS: Objection for the record, please.

COURT: Overruled.

A. —a boy in prison with him, named Woody Butler, had been talking to him about a man and his son that had been killed in Rennert.

George knew—George told us he knew who killed Hiram and his son. And he said George wanted to talk to me.

Myself and Detective Donald Britt went to the Pender County Correctional Institute to talk with George Blackwell. At 10:30 a.m., myself and Detective Donald Britt talked to George Blackwell in the chapel.

George told us that Woody Butler told him—

Ms. BIGGS: Objection, Judge. It has exceeded the question.

COURT: Overruled.

Q. What did George Blackwell tell you in the chapel there at the prison?

A. That a young guy, he didn't know the young guy's name, and Carlos Canady had killed the man and his son in Rennert.

George went on to say that Woody Butler told him—

Ms. BIGGS: Objection, Judge. Now it's double hearsay.

COURT: Overruled.

Q. What else did Mr. Blackwell tell you?

A. He went on to say that the man and the boy—George said that Woody said Carlos and the young guy went to the man's house and broke into—

Ms. BIGGS: Objection, Judge. This exceeds the scope of voir dire.

COURT: Overruled.

A. —broke into the house through a window. Carlos had a rifle—

Ms. BIGGS: Objection. Judge, we want to be heard, please.

COURT: Mr. Deputy, if you'll take the jury to the deliberation room.

At this point, outside the jury's presence, defendant argued Carter's testimony was irrelevant and was merely an attempt to get before the jury inadmissible hearsay and to avoid putting George Blackwell or Woody Butler on the stand. Defendant also argued Carter's testimony was double or triple hearsay, and its prejudicial effects far outweighed any probative value. Defendant further argued Carter could explain his subsequent conduct without going into the details of Blackwell's statement. The trial court overruled defendant's objection, and the State's examination continued in the jury's presence:

Q. Detective Carter, what did George Blackwell tell you about information he had relating to the murders of Hiram and Michael Burns?

Ms. BIGGS [defense counsel]: Objection.

COURT: Overruled.

A. George told us that the—Carlos and the young guy went into the house, went into the bedroom. Carlos—the young guy went into the bedroom with a bat and Carlos went into the bathroom with a rifle.

When the man came down the hall and started in the bedroom where the young guy was, Carlos said, "I couldn't let the man go into the—

Ms. BIGGS: Objection.

COURT: Overruled.

A.—where the young guy was with the bat," and that's when he shot them.

Carlos took the money bag and ran and dropped most of—some of the money in the yard.

The State correctly asserts a statement is not hearsay if it is offered for a purpose other than to prove the truth of the matter asserted. See N.C.G.S. § 8C-1, Rule 801(c) (1999); State v. Braxton, 352 N.C. 158, 190, 531 S.E.2d 428, 447 (2000), cert. denied, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). A statement which explains a person's subsequent conduct is an example of such admissible nonhearsay. State v. Anthony, 354 N.C. 372, 404, 555 S.E.2d 557, 579 (2001); State v. Golphin, 352 N.C. 364, 440, 533 S.E.2d 168, 219 (2000), cert. denied, —— U.S. ——, 149 L. Ed. 2d 305 (2001).

In the present case, however, Detective Carter's testimony provided more than a mere explanation of his subsequent actions. Carter provided details contained in Blackwell's statement including how defendant broke into the victims' house through a window, went into the bathroom with a rifle, shot one of the victims, and fled with a bag of money. Moreover, the State relied upon Carter's recitation of Blackwell's detailed statement during the State's closing argument. The State argued:

> So he [Carter] goes and interviews George Blackwell. And Mrs. Biggs kept referring to this as hearsay, as hearsay. Hearsay is evidence that doesn't come in.
>
> Ms. BIGGS [defense counsel]: Objection, that's not the law.
>
> THE COURT: Overruled.
>
> MR. BRITT [prosecutor]: James Carter and Donnie Britt went to Pender County, to the prison there where they interviewed George Blackwell. George Blackwell told them he had gotten the information that Carlos Canady had committed those murders. Carlos Canady and a young boy had broken into the house; that Carlos went in there with a rifle; that the young boy went in there with a baseball bat. And they laid in wait. They were going there to rob the man when he came home; and on the way out, they lost some of the money.

This portion of the State's closing argument confirms that the State did not use Carter's statement merely as an explanation of subsequent actions. Instead, the State relied on Carter's testimony as substantive evidence of the details of the murders and to imply defendant had given a detailed confession of his alleged crimes. By using Carter's testimony in this manner, the State undoubtedly sought to prove the truth of the matter asserted. Accordingly, the testimony at issue was inadmissible hearsay. Moreover, despite the trial court's provision of a limiting instruction, we hold Detective Carter's testimony went so far beyond the confines of this instruction that the jury could not reasonably have restricted its attention to any nonhearsay elements in Carter's testimony. *See State v. Austin*, 285 N.C. 364, 367, 204 S.E.2d 675, 677 (1974).

[2] The trial court's error relating to Detective Carter's testimony was not limited to the portions of testimony outlined above. Rather, the error was greatly compounded when the trial court denied

defendant the opportunity to fully cross-examine Carter concerning portions of his testimony.

During his cross-examination of Carter, defendant tried to ask several questions to undermine the credibility of Blackwell's information:

Q. Did you go talk with Woody Butler?

A. I didn't, but some of the other officers did.

Q. And based on Woody Butler's statement, or based on the information that you understand was taken from Woody Butler, that he never gave George Blackwell that information—

Mr. Britt [prosecutor]: Objection. Move to strike. Would like to be heard.

The State argued these questions solicited inadmissible hearsay. Defendant argued the State had been permitted to ask Carter about statements Butler made to Blackwell, and so it was appropriate for defendant to inquire if Carter talked with Butler and if Butler denied making the statements at issue. After the trial court denied defendant the opportunity to continue this line of questioning, defendant made the following offer of proof:

Q. Mr. Carter, based on the information that you received from these officers that Woody Butler had denied any knowledge of this incident where he supposedly told George Blackwell this information, did you at any time go talk with George Blackwell after that?

A. No, no, I didn't.

Q. To your knowledge, did any of the other officers ever go talk with John Blackwell—excuse me, George Blackwell again?

A. Yes.

      . . . .

Q. Now, George Blackwell is serving—is it a life sentence as a habitual felon?

A. I don't know.

Q. Did you investigate what his motives for telling you this is [sic] or investigate the source of information he received it from?

A. I don't have anything in my notes about that.

Q. Did you even determine if he was in custody or incarcerated at the time the murders happened, or where he was living during that period of time, if he wasn't?

A. No.

. . . .

Q. Did you find out where George Blackwell was from?

A. I· knew Blackwell had lived in the Saddletree community at one time. I knew that.

Q. So you knew he had a connection to Robeson County and could have had information about these murders from other sources?

A. Yes.

At this point, the trial court sustained the State's objection and stated defendant was trying to admit hearsay.

After a thorough review, we hold defendant's proposed questions were designed to impeach the segment of Carter's testimony that provided details of defendant's alleged crimes. Once the trial court permitted Carter to testify on direct examination to these details, the trial court should have permitted defendant to present any evidence that would have been proper to impeach Butler or Blackwell if either of them had testified. *See* N.C.G.S. § 8C-1, Rule 806 (1999). Accordingly, because the questions defendant proposed would have been proper if Butler or Blackwell had testified, the trial court erred in failing to allow defendant's questions.

Additionally, during the State's examination, Carter was permitted to testify about the statements Butler made to Blackwell in order to explain Carter's subsequent actions. As such, defendant's proposed cross-examination questions also appear proper to determine whether Carter's subsequent investigation included an examination of Blackwell's motive for implicating defendant and Blackwell's other potential sources of information.

Accordingly, we conclude the trial court not only erred in permitting the State to admit details of the murders via hearsay testimony from Carter, but also erred in denying defendant an opportunity to properly cross-examine Carter concerning these details.

**[3]** Defendant further contends the trial court erred when it failed to require the State to disclose names of informants with material, exculpatory information that someone other than defendant committed the offenses. We agree with defendant that this potentially exculpatory evidence was material to his defense. This suppression, combined with defendant's other assignments of error, constituted reversible error and denied defendant a fair trial.

Defendant filed multiple motions to require the State to disclose various exculpatory materials. In one motion, defendant specifically requested that the State provide the name of an informant who implicated five other people as being involved in the murders and indicated where the murder weapon could be found. The trial court denied defendant's motion. The trial court also denied a defense motion to disclose "the name[] and address of the subject who was brought back from Mississippi by [police] who made the statements about Thompkins being the 'big man' and had arranged the murders."

In *Brady v. Maryland,* the United States Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218 (1963). "Favorable evidence is material if there is a 'reasonable probability' that its disclosure to the defense would result in a different outcome in the jury's deliberation." *State v. Strickland,* 346 N.C. 443, 456, 488 S.E.2d 194, 202 (1997), *cert. denied,* 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). The determination of the materiality of evidence must be made by examining the record as a whole. *State v. Howard,* 334 N.C. 602, 605, 433 S.E.2d 742, 744 (1993). The State has not satisfied its duty to disclose unless the information was provided in a manner allowing defendant "to make effective use of the evidence." *State v. Taylor,* 344 N.C. 31, 50, 473 S.E.2d 596, 607 (1996).

Here, defendant had neither the name of the informant who gave the State information about the five individuals nor the name of the subject brought back from Mississippi by police. Defendant thus could not effectively use that information at trial. Defendant needed access to these individuals to interview them and develop leads. There is a reasonable probability that if defendant had access to informants who had names of others involved in the murders, such information could have swayed the jury to reach a different outcome.

Defendant had a right to this information in a timely manner so he could effectively use it.

Our confidence in the outcome of this case is undermined by defendant's inability to interview witnesses with potentially exculpatory information. Accordingly, we hold suppression of this information was error.

[4] In another assignment of error, defendant contends his constitutional rights were violated when the trial court allowed an expert to testify without allowing defendant an opportunity to examine the expert's testing procedure and data. We agree. Considered in isolation, this error may not be sufficiently prejudicial to warrant a new trial, but taken in conjunction with defendant's other assignments of error, it constitutes reversible error.

The State's firearms expert, State Bureau of Investigation Agent Al Langley, testified concerning a gun found in the Lumber River over three years after the crimes occurred. According to Langley, the gun appeared to be the murder weapon. The gun was test-fired, and the spent bullets were compared to those found at the scene.

On defendant's motion, the trial court ordered the State to turn over the test-fired bullets and "underlying data examinations." The State was unable to locate the shells. Defendant requested that the State either retest the gun and provide defendant with the new tested shells or that testimony from the State's firearms expert be excluded. The trial court did not order the State to retest the gun but allowed the State's expert to testify.

A defendant in a criminal proceeding has the constitutional right to confront his accusers and the witnesses against him. U.S. Const. amend. VI; N.C. Const. art. I, §§ 19, 23 (2000). This includes the right to prepare and present a defense. *State v. Graves*, 251 N.C. 550, 557, 112 S.E.2d 85, 91 (1960). This constitutional right " 'ensure[s] the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' " *State v. Brewington*, 352 N.C. 489, 507, 532 S.E.2d 496, 507 (2000), (quoting *Maryland v. Craig*, 497 U.S. 836, 845, 111 L. Ed. 2d 666, 678 (1990)), *cert. denied*, 531 U.S. 1165, 148 L. Ed. 2d 992 (2001).

In the present case, defendant was not afforded the opportunity to rigorously test the State's firearms evidence, thus interfering with defendant's right to present a full defense. Therefore, we agree with

defendant that the trial court erred in neither suppressing the testimony of the State's firearms expert nor ordering the State to retest the weapon. When viewed with the other erroneous actions of the trial court, a new trial is required.

In conclusion, while defendant's trial was riddled with errors, we decline to address every potential error as these errors are unlikely to recur at a new trial. We conclude that the errors outlined above, taken as a whole, deprived defendant of his due process right to a fair trial free from prejudicial error.

For the foregoing reasons, we conclude the trial court's errors were prejudicial to defendant's right to a fair trial and defendant is entitled to a new trial.

NEW TRIAL.