STEPHENS, Judge.
Factual and Procedural Background
In February 2012, Defendant Kelvyn M. Vales was arrested on charges of sexual misconduct with his stepdaughter, "Maggie,"[1] who was born in December 1993. The arrest resulted from the following events, as revealed by the evidence at trial: Vales moved into a home with Maggie, her siblings, and her mother, "Kay," in July 2008 when Maggie was 14 years old. Vales married Kay in December 2008, just before Maggie's fifteenth birthday. Vales began sexually abusing Maggie when she was fifteen years old and in the ninth grade, and the abuse continued for approximately three years. Vales initiated the abuse by giving Maggie back massages and kissing her. After a few weeks, Vales forced Maggie to perform fellatio on him. Shortly thereafter, Vales performed cunnilingus on Maggie and then tried to have vaginal intercourse with her, but had to stop because it was too painful for Maggie. Instead, Vales had anal intercourse with Maggie. Vales had anal intercourse a second time with Maggie, and, later, on the third attempt, Vales was able to have vaginal intercourse with her.
Vales continued to have intercourse with Maggie regularly until June or July 2011 when Kay forced Maggie to leave her home. On 2 January 2012, when she was a high school senior, Maggie first told her mother that Vales had been sexually abusing her. Kay told Maggie not to disclose this abuse to her siblings still living with Kay and Vales. That evening, Maggie's younger sister, "Ella," born in 1999, told Maggie by text message that Vales had given Ella a "massage and he touched my but[t] with his hand and thing[,]" an experience Ella described as "uncomfortable." In response, Maggie confronted her mother about Vales's inappropriate massage of Ella and, when Kay did not kick Vales out of her home, Maggie called police departments in Duluth, Georgia, and then in Charlotte[2] to report her own sexual abuse by Vales.
On 20 February 2012, Vales was indicted on three counts of statutory rape, three counts of taking indecent liberties, and one count of sexual offense by a person in a parental role. The matter came on for trial at the 14 July 2014 criminal session of Mecklenburg County Superior Court. On 17 July 2014, the jury acquitted Vales on the statutory rape charges, but returned guilty verdicts on the remaining charges. The trial court sentenced Vales to four consecutive presumptive-range terms in prison, 13-16 months for each of the indecent liberties convictions, and 25-39 months for the sexual offense by a person in a parental role conviction. Vales gave notice of appeal in open court.
Discussion
Vales brings forward two arguments on appeal: (1) that the trial court erred in admitting Maggie's testimony about Ella's disclosure of the massage by Vales and (2) that Vales received ineffective assistance of counsel. We find no error in the admission of Maggie's testimony and dismiss Vales' ineffective assistance of counsel claim without prejudice.
I. Maggie's testimony about Ella's messages
Vales first argues that the trial court erred in admitting Maggie's testimony about a text message from Ella concerning the massage Vales gave Ella. Specifically, Vales contends that admission of Maggie's testimony about Ella's disclosure was inadmissible hearsay. We disagree.
Rule 801 of the Rules of Evidence defines hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Consequently, ... out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay. In particular, statements of one person to another to explain subsequent actions taken by the person to whom the statements were made are admissible as non-hearsay evidence. The reason such statements are admissible is not that they fall under an exception to the hearsay rule, but that they simply are not hearsay-they do not come within the legal definition of the term. The trial court's determination as to whether an out-of-court statement constitutes hearsay is reviewed de novoon appeal.
State v. Castaneda,215 N.C.App. 144, 147, 715 S.E.2d 290, 293 (citations, internal quotation marks, brackets, and some ellipses omitted; italics added), appeal dismissed and disc. review denied,365 N.C. 354, 718 S.E.2d 148 (2011).
In turn, because the witness testifies about the out-of-court statements only to explain the witness's subsequent actions and not for the truth of the statements, the State may not reference the testimony as substantive evidence in its closing argument. State v.. Canady,355 N.C. 242, 249, 559 S.E.2d 762, 766 (2002). In Canady,our Supreme Court held that, when the State attempts to use a witness's "testimony in this manner, the State undoubtedly [seeks] to prove the truth of the matter asserted." Id.Such usage transforms the witness's testimony into inadmissible hearsay. Id.Further, the scope of testimony about out-of-court statements admitted to explain a witness's subsequent actions must be reasonably restricted so as to serve this limited purpose. Id.Without such a restriction, the testimony may become inadmissible, as in Canadywhere, "despite the trial court's provision of a limiting instruction, [the] testimony went so far beyond the confines of this instruction that the jury could not reasonably have restricted its attention to any nonhearsay elements in [the] testimony." Id.In other words, the testimony in Canadysuffered from two errors: it went too far beyond the scope reasonably needed to explain the witness's subsequent actions, and it was treated as substantive evidence by the State in its closing argument. See id.
Here, Vales contends that Maggie's testimony about what Ella told her by text and phone suffered from the same flaws: that it was more detailed than necessary to explain why Maggie called the police and that the State improperly used the testimony in an attempt to prove the truth of the matter asserted. We are not persuaded by either contention.
The State forecast Maggie's testimony in its opening statement as follows:
Still a secret, not many people knew at that point. Until [Maggie] found out that her little sister, [Ella], was about to become the victim of the defendant. She got a text message from her little sister, who was 11 or 12 at the time, saying that mom was out of town, the defendant gave her a massage. He used his hands, touched the sides of her boobs, she felt his penis on her back. She felt so [un]comfortable that she left. She didn't tell her mom either. That was her little secret for a short time.
That was the moment, three years after the fact, that [Maggie] finally decided to say something. She finally decided to call the police, and she called to make a report for her sister. She never intended to share her own personal secret because she felt some responsibility, even though she was a child. He was the adult in the relationship. But she made a decision to report it to protect her little sister.
(Emphasis added). In this forecast of Maggie's testimony, the State explicitly connected Maggie's discovery of the massage to Maggie's decision to contact police.
On direct examination, Maggie testified, over Vales's objection, about how she learned about the massage from Ella:
Q. What did [Ella] tell you over that text message?[3]
A. [Ella] told me that one time when [the girls' mother] was not at home-my mom, sorry. One time when my mom was not home she was staying with [Vales] and [Vales] asked her to give him-or, he told her he was going to give her a massage, I guess. And he ended up rubbing the sides of her breasts and rubbing his penis on her bottom. And I told-I asked her if she had said anything to anybody, and she told me that she had told my mom and that they had already talked about it and he said he didn't mean to make her feel uncomfortable.
....
Q. She told you that he had touched the sides of her breasts and rubbed his penis on her?
A. Yes, ma'am.
Q. Was that the first time you had heard about him touching your younger sister?
A. Yes.
Q. How did that make you feel?
A. It made me upset.
Q. Okay. Why did it make you upset?
A. Because I had previously spoken to him about him not doing that ever to anybody, especially my sister. And he said he wouldn't. And I felt-I mean, obviously I don't know why I believed him.
The trial court gave the jury a limiting instruction, directing them to consider Maggie's testimony about what Ella told her only for the purpose of understanding Maggie's subsequent actions. Maggie went to on to testify about confronting her mother, her mother's refusal to force Vales out of the family home, and Maggie's decision then to contact law enforcement.
Ella testified, without objection, to essentially the same events, with the sole exception that she did not say that Vales had touched her breasts:
I had my stomach against the bed. And [Vales] gave me-well, when I went into the room he told me to take off the shirt that I had-that I was wearing, because I had on an undershirt and some shorts. And then he told me to lay down on the bed, so I laid with my stomach on the bed. And he gave me a massage, where he massaged from here (indicating) and my shoulders. And he went down to my butt and massaged that. And then after that when he went back up to my shoulders I remember feeling his penis against my butt.
In its closing argument, the State erroneously attributed the testimony that Vales touched Ella's breasts during the massage to Ella, rather than to Maggie: "And then you have the testimony of [Ella].... So now he's still the stepdad, she's about 12, and he wants to give her a massage. He doesn't just massage her back, he asks her to take off her shirt first. Lay on his bed while mom's out of town. He tells her not to tell mom. That's weird and creepy. He touches her boobs,he massages her butt." (Emphasis added). Later, the State noted that the jury had to judge Ella's credibility, again erroneously conflating the detail about Vales touching Ella's breasts from Maggie's testimony with Ella's actual testimony: "[Ella] said, he gave me a massage, touched my boobs,I felt his penis, I was uncomfortable...." (Emphasis added).
Vales contends that Maggie could have explained her subsequent actions by simply testifying that Ella's text said Vales had given her a massage that made Ella uncomfortable. We disagree. We believe the inappropriately sexual nature of the massage was a key detail in understanding why Maggie would feel such urgency to report Vales to law enforcement officers, and thus we conclude that Maggie's testimony did not go "so far beyond the confines of [the limiting] instruction that the jury could not reasonably have restricted its attention to any nonhearsay elements in [Maggie's] testimony." See id.Maggie's testimony is utterly unlike that of the witness in Canady,a detective whose testimony "provided details contained in [a co-defendant's] statement including how [the] defendant broke into the victims' house through a window, went into the bathroom with a rifle, shot one of the victims, and fled with a bag of money." Id.In any event, we fail to see how Vales could have been prejudiced by Maggie's testimony given that Ella testified, without objection, to virtually the same events.[4]
As for the State's use of Maggie's testimony, the State's opening statement explicitly linked Maggie's receipt of the text message from Ella to Maggie's desire to protect Ella by calling the police. The State did not argue that Maggie's testimony would prove Vales sexually abused Ella by giving her an inappropriate massage. Nor did the State make such a claim in its closing argument. Rather, the State argued that Ella's own testimony proved that Vales had given her the massage. As for the State's misattribution of the detail about Vales touching Ella's breasts during the massage, we conclude that, in light of Ella's testimony that Vales had her strip down to shorts and an undershirt and lie down on a bed before he sat on her so that she could feel his penis against her buttocks while Vales massaged Ella's back and buttocks in a manner Ella found very uncomfortable, it cannot have had any impact on the jury's decision. This argument is overruled.
II. Ineffective assistance of counsel
Vales also argues that he received ineffective assistance from his trial counsel. We dismiss this argument without prejudice.
To prevail on a claim of ineffective assistance of counsel, a defendant must first show that his counsel's performance was deficient and then that counsel's deficient performance prejudiced his defense. Deficient performance may be established by showing that counsel's representation fell below an objective standard of reasonableness. Generally, to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
State v. Allen,360 N.C. 297, 316, 626 S.E.2d 271, 286 (citations and internal quotation marks omitted), cert. denied,549 U.S. 867, 166 L.Ed.2d 116 (2006). Further,
ineffective assistance of counsel claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e.,claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing. Thus, when this Court reviews ineffective assistance of counsel claims on direct appeal and determines that they have been brought prematurely, we dismiss those claims without prejudice, allowing [the] defendant to bring them pursuant to a subsequent motion for appropriate relief in the trial court.
State v. Thompson,359 N.C. 77, 122-23, 604 S.E.2d 850, 881 (2004) (citation and internal quotation marks omitted; italics added), cert. denied,546 U.S. 830, 163 L.Ed.2d 80 (2005).
Here, Vales points to five decisions, acts, or omissions by his trial counsel that he contends establish ineffective assistance of counsel, including, inter alia,selecting witnesses at a pretrial hearing on the admissibility of Ella's testimony, cross-examining Ella on various points, and misstating witness testimony in his closing argument. We cannot evaluate the merits of Vales' contentions on the cold record, and, accordingly, we dismiss this claim without prejudice.
NO ERROR in part; DISMISSED WITHOUT PREJUDICE in part.
Judges STEELMAN and McCULLOUGH concur.
Report per Rule 30(e).
Opinion
Appeal by Defendant from judgments entered 17 July 2014 by Judge Mark E. Powell in Mecklenburg County Superior Court. Heard in the Court of Appeals 6 May 2015.

To protect the identity of the victim, we refer to the victim, her mother, and her sister by pseudonyms.

The family had originally lived in Charlotte, but moved to Georgia in 2010. In June or July 2011, when her mother kicked Maggie out of the family home, Maggie moved back to Charlotte to live with an older sister.

Screenshots of the text messages between Maggie and Ella included in the record on appeal do not mention Vales touching Ella's breasts. However, Maggie testified that she and Ella also discussed the massage during at least one telephone conversation.

Defendant argues strenuously that Maggie's testimony was inconsistent with Ella's account in that Ella "never testified that [Vales] touched her breasts[.]" However, as noted in the excerpt of her testimony quoted above, when Ella described the massage, she gestured: "And he gave me a massage, where he massaged from here (indicating) and my shoulders. And he went down to my butt and massaged that." The transcript does not further describe what part of her body Ella indicated, but we note that, unlike this Court, both the trial court and the jury where able to observe this gesture.