STATE OF NORTH CAROLINA v. MAURICE RASHAD MILLER

No. COA08-650

(Filed 19 May 2009)

**1. Evidence— relevance—interrogation of defendant—detectives' questions—third-party statements embedded**

Questions from detectives to defendant that included statements attributed to nontestifying third parties were relevant to facts in dispute and gave context to defendant's responses.

STATE v. MILLER

[197 N.C. App. 78 (2009)]

**2. Evidence— hearsay—interrogation of defendant—detectives' questions—third-party statements embedded**

Questions from detectives to defendant that included statements attributed to nontestifying third parties were not hearsay where they were offered not for the truth of the matter asserted, but so that the jury could understand the circumstances in which defendant was caught in a lie, changed his story, and made significant admissions of fact.

**3. Evidence— ruling on admissibility—recording not seen— no abuse of discretion**

The trial court did not fail to exercise its discretion in violation of N.C.G.S. § 8C-1, Rule 403 by not viewing a recording of defendant's interrogation before ruling on whether certain portions should be redacted where the court asked the parties to provide a forecast of what was in the DVD, made its ruling based on the forecasts, and gave a limiting instruction on the disputed evidence. Moreover, the cases cited do not stand for the proposition that a trial court's decision to not physically view evidence before admitting it constitutes an absolute failure to exercise discretion.

**4. Evidence— recording of interrogation—request to redact refused—no abuse of discretion**

The trial court did not abuse its discretion in a prosecution for murder and other offenses by not redacting portions of a recording of defendant's interrogation where the court heard counsels' arguments, took relevant case law into consideration, listened to counsels' forecast of what was contained in the DVD, and determined that redacting the questions in issue would confuse the jury. The court gave a limiting instruction, and the challenged evidence constituted a small portion of the interview.

**5. Robbery— instructions—attempt—intent to commit completed offense**

There was no plain error in instructions on attempted robbery with a firearm and acting in concert where the court was clear that the jury had to find the intent by defendant to commit the completed substantive offense.

**6. Robbery— instructions—attempted robbery—intent to commit substantive crime—no plain error**

The difference between an attempted robbery and a robbery is defendant's success or failure in obtaining the property, and

STATE v. MILLER

[197 N.C. App. 78 (2009)]

instructions on first-degree burglary and its lesser-included offenses, taken as a whole, were sufficiently clear to inform the jury that defendant had to have the intent to commit a robbery and not merely the intent to commit an attempt.

### 7. Homicide— felony murder—instructions—no plain error

There was no plain error in an instruction on felony murder where the court's initial instruction was technically erroneous, but the court's latter instructions served to eliminate all possibility of error or confusion. Moreover, the jury verdict sheets clearly and correctly stated the underlying felonies that could support a conviction for felony murder.

Appeal by defendant from judgments entered 18 December 2007 by Judge Jerry Cash Martin in New Hanover County Superior Court. Heard in the Court of Appeals 10 February 2009.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General Joan M. Cunningham, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Constance E. Widenhouse, for defendant-appellant.*

HUNTER, ROBERT C., Judge.

Maurice Rashad Miller ("defendant") appeals from two 18 December 2007 judgments entered in accordance with jury verdicts finding him guilty of: one count of first degree murder based on the felony murder rule; one count of first degree burglary; and one count of attempted robbery with a dangerous weapon, specifically with a firearm. All three convictions were based on the theory of acting in concert. The trial court consolidated the first degree burglary and felony murder convictions and sentenced defendant to life imprisonment without parole. The court arrested judgment for the attempted robbery with a firearm conviction.

## I. Background

The State's evidence tended to show that on the evening of 22 January 2006, LaKendra Grady ("Grady"), Rufus Bowser ("Bowser") and Darian Graham ("Graham") were together at defendant's residence while he was at work. Of these three, only Bowser testified at trial, and he did so pursuant to a plea agreement.[1] Bowser testified

---

1. At the time of the robbery, Bowser was fourteen years old. He testified that he received a plea agreement for second degree murder and armed robbery. On cross-

that he possessed a Tech-9 assault rifle ("Tech-9"), Grady possessed a 9-millimeter handgun ("9mm"), and Graham possessed a .357 revolver (".357"). He further stated that, prior to defendant's arrival, he, Grady, and Graham had spent two hours "just planning to rob somebody"; however, they did not have anyone specific in mind.

Bowser testified that defendant arrived home around 10:30 p.m., at which point defendant sat at the kitchen table and talked with the others, and Bowser showed him his Tech-9. Bowser further stated that the three of them "just told [defendant] about the robbery," and defendant "was like, '[a]ll right[,]' " and came along with them. During cross-examination, Bowser stated that Grady and a man named "D.J." planned the robbery and that D.J. suggested Pervis Owens ("Owens") as a potential target. Bowser also testified that defendant was at work and was not present when Owens was selected as the target for the robbery.

Defendant admitted he knew that Grady had plans to rob someone prior to leaving his residence with her, Bowser, and Graham, but stated that he "didn't know it was Pervis Owens." However, during an interview conducted by Detective Lee Odham ("Detective Odham") and Detective William Young ("Detective Young") at the Wilmington Police Department on 28 January 2006, defendant stated that Grady had come into his bedroom, along with Graham and Bowser, and told him about wanting to rob Owens because he had a lot of money.[2] During the interview, Detective Odham asked defendant, "You went there with only the intent of robbing this guy. That was it?" Defendant responded, "Yeah, but I really didn't even want to do that. But that's what, yeah, I guess you could say that, yeah. Detective Odham inquired further, "All you wanted to do was rob him. You didn't want to hurt him?" Defendant responded, "I didn't even want to rob him, but . . ." at which point Detective Odham interrupted him. Detective Odham then said, "But you were there . . . ." and defendant interrupted, stating "yeah, to rob him[,]" while nodding affirmatively.

---

examination, Bowser admitted that he knew this agreement eliminated the possibility of a life sentence.

2. As discussed *infra*, the State presented to the jury a DVD recording of this interview, which began either "very late" in the evening on 27 January or shortly after midnight on 28 January 2006. No transcription of the interview was prepared or included in the record. Nevertheless, the DVD is included in the record and is properly before us. We have reviewed the DVD in its entirety and include some of its pertinent content herein.

STATE v. MILLER

[197 N.C. App. 78 (2009)]

Defendant, Bowser, Graham, and Grady left defendant's residence in a car driven by Grady. Bowser testified that they drove around for several hours and did not talk about the robbery or have a plan. According to Bowser, during much of the time, Grady was making calls on her cell phone and eventually reached Owens. However, in his interview with Detectives Odham and Young, defendant stated that Grady talked about "how she was going to do [the robbery]" while she drove. Defendant also told police that originally the plan was for them to rob Owens at the door of his residence, but that he (defendant) told Grady that he did not like that plan and that she had to come up with a new one. Bowser testified that, while in the car, Grady had the 9mm, Graham had the .357, and he had the Tech-9.

The group arrived at Owens's house sometime in the early morning of 23 January 2006, while it was still dark. Upon arrival, all four got out of the car. Grady told the others to wait five minutes and then to follow her into the house. She then proceeded to enter Owens's house. Bowser testified that, at this point, he still had the Tech-9 and Graham still had the .357, but that defendant, not Grady, had the 9mm.

According to Bowser, Grady did not come back out of the house or give any kind of signal before he and defendant went into the house. During his interview with police, defendant stated that Grady came out of the house, made a noise, and told the others that the robbery would be easy because Owens was asleep. Bowser testified that he entered Owens's residence first, putting his shirt around his face in the process. He stated that defendant did the "[s]ame thing" and followed him inside. On cross-examination, defendant conceded that he had previously told the detectives that he covered his face with the hood of his sweatshirt as he entered Owens's house. Graham remained outside.

According to Bowser, when he and defendant entered the house, Grady was not present, and Owens was asleep in a recliner. Bowser pointed his gun at Owens, "walked up to him and told him to get up." His intention was to have Owens "show [him] where the money was at." Bowser stated that Owens jumped up from his chair and tackled him, but that he escaped from Owens and ran out the door. Bowser testified that after he left the house, he heard a gunshot. He stated that defendant left the house after him, but that he "couldn't really see" whether there was anything in defendant's hands at that time.

Defendant told the detectives that he was inside near the front door and trying to make it back outside when he heard a gunshot behind him. He stated that he thought Grady was probably the one who shot Owens.

According to Bowser, he, Graham, and defendant all ran to Graham's house and hid the three guns under a mattress. At this point, he noticed that defendant had the 9mm in his possession. On cross-examination, however, Bowser stated that he had previously told police that he had seen Grady with the 9mm the next day. Bowser also testified that, a few days after the incident, defendant told him, "[I've] got to live with killing somebody."

Owens was found dead on his front lawn. His death was attributed to a single gunshot wound. The State's forensic scientist identified the bullet as a "9-millimeter Luger".

Rose Samuel, Owens's neighbor, had a surveillance camera on her porch pointed towards the alley between the houses. This camera was recording at the time of the robbery and provided an audio account of some of the events that had occurred outside of Owens's residence. Through the assistance of witnesses, Detective Owens was able to identify Grady's voice on the tape. Subsequent to this, Detective Odham obtained a warrant for Grady's arrest for first degree murder.

After questioning Grady, Detective Odham then spoke with Graham. Graham provided the detectives with the 9mm that was purportedly used in the murder. After speaking with Graham, Detective Odham then contacted defendant to question him about the case. Either very late on 27 January or shortly after midnight on 28 January 2006, defendant, accompanied by his mother and step-father, went voluntarily to the Wilmington police station. Detective Odham did not place defendant under arrest at this time, and before he questioned defendant, Detective Odham read him his Miranda rights. Defendant indicated that he understood his rights and signed a written waiver form.

At trial, the jury was shown the DVD recording of defendant's 28 January 2006 interview, in which Detectives Odham and Young asked defendant numerous questions about his involvement in the events that transpired at Owens's house. Some of the detectives' questions contained statements incriminating defendant that were allegedly made by others, including Grady, Graham, Bowser, and defendant's

sisters.[3] With the exception of Bowser, none of the individuals to whom the statements were attributed testified at trial.

At trial, defendant testified on his on behalf. He stated that when he arrived at home on the evening of 22 January 2006, he could not see the three guns because Grady, Bowser and Graham were at the kitchen table and his view was blocked by a dividing wall. Defendant further testified that shortly after arriving at his residence, he went up to his bedroom to play computer games. He claimed he did not see a gun until Grady came into his room with the 9mm approximately thirty minutes later. He also denied any involvement in planning the robbery.

Defendant testified that when he left the house with the others, he did not know that Owens was the intended target. He also claimed that he never held Grady's 9mm and did not touch any of the guns subsequent to getting into the car.

According to defendant, when the group arrived at Owens's residence, they all got out of the car, and Grady said she would be back in five minutes. Defendant claimed that he then walked to a basketball park across the street to smoke a cigarette. He said that he saw Grady knock on the door and enter Owens's house, that he saw Owens, and that he was "pretty sure" that Owens saw him across the street.

After five minutes had passed, Grady came out of the house and proceeded to have a conversation with Bowser and Graham. Defendant stated that he crossed the street to join them after they signaled for him. Defendant testified that he thought they were welcome in the house because the door was "wide open." He also stated that he thought they were going inside so Grady could buy drugs. Defendant admitted that his hood was up when he went inside the house, but stated that it was already up because it was cold outside.

According to defendant, when he entered the house, both Grady and Bowser were in the living room. Bowser had the Tech-9 and Grady had the 9mm. When Bowser woke up Owens, defendant ran to the door to leave the house but was unable to do so because the door was stuck. Defendant testified that he heard a gunshot behind him but did not see or know who shot Owens. Defendant also stated that

3. One sister was referred to as "Nay Nay"; the other was referred to as "Dee-dee". (Phonetic spellings).

STATE v. MILLER

[197 N.C. App. 78 (2009)]

he did not possess a weapon at Owens's house and that he did not place the 9mm under the mattress at Graham's house.

Other facts necessary to the understanding of this case are set out in the opinion below.

## II. Analysis

### A. DVD Recording and Statements of Non-Testifying Others

First, defendant argues that the trial court committed reversible error by admitting into evidence the DVD recording of his 28 January 2006 police interview without redacting those questions posed to him by Detectives Odham and Young which contained statements attributed to non-testifying third parties. Defendant concedes that his answers to these questions are relevant, but contends that the statements attributed to non-testifying third parties, which were contained in the detectives' questions, should have been redacted before the DVD was presented to the jury. Specifically, he asserts that the detectives' questions that contained statements purportedly made by non-testifying others, including his co-defendants and his sisters, are both irrelevant and inadmissible hearsay, that lack any probative value aside from proving the truth of the matter asserted. Consequently, defendant contends that the admission of these questions violated the North Carolina Rules of Evidence and his state and federal constitutional rights of confrontation. In the alternative, defendant argues that the trial court committed reversible error by not viewing the DVD prior to ruling on the admissibility of the objected to questions and/or that these questions should have been excluded pursuant to N.C. Gen. Stat. § 8C-1, Rule 403 (2007) because whatever probative value the questions arguably had was substantially outweighed by the danger of unfair prejudice. As discussed *infra*, we disagree.

With regard to the DVD and its content, the trial judge ruled that: (1) the detectives' questions, and defendant's responses were relevant under N.C. Gen. Stat. § 8C-1, Rule 401 (2007); (2) defendant's responses to the questions were admissible pursuant to N.C. Gen. Stat. § 8C-1, Rule 801(d)(A) (2007) as "admission[s] by a party opponent"; and (3) the out-of-court statements purportedly made by co-defendants and others that were contained in the detectives' questions were not hearsay, as they were not offered to prove the truth of the matter asserted, but rather to explain the officers' course of investigation and to show their effect on defendant. The court also found that redacting the detectives' questions would make defend-

ant's answers to those questions unintelligible and confuse the jury and concluded that their prejudicial effect did not substantially outweigh their probative value. Finally, the court gave a limiting instruction telling the jury not to consider the statements attributed to nontestifying third parties for the truth of the matter asserted.

On appeal, as he did below, defendant objects to eight specific portions of the detectives' questions, which he contends were erroneously admitted. These include purported statements made by: (1) defendant's sisters that he was downstairs at the kitchen table when Grady was talking about the robbery; (2) unidentified "other people" that defendant left the house on the night of the murder; (3) defendant's sisters that he was present in the house when others were talking about the robbery; (4) Grady and Graham that defendant was in the house when others were talking about the robbery; (5) unidentified "people" that defendant was at Owens's house on the night in question; (6) Grady that defendant, Bowser, and Graham were with her at Owens's house on the night in question; (7) Grady that she gave a gun to defendant; and (8) Graham that defendant pulled a gun out as he ran into Owens's house and that defendant and Bowser put their " 'hoodies up' " before going inside the house.

### i. Relevance

**[1]** First, defendant contends that these questions should have been redacted because they are not relevant. This argument is without merit.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. "[I]n criminal cases, every circumstance that is calculated to throw any light upon the supposed crime is admissible." *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E.2d 506, 513 (1965), *cert. denied*, 384 U.S. 1020, 16 L. Ed. 2d 1044 (1966). "In order to be relevant, . . . evidence need not bear directly on the question in issue if it is helpful to understand the conduct of the parties, their motives, or if it reasonably allows the jury to draw an inference as to a disputed fact." *State v. Roper*, 328 N.C. 337, 356, 402 S.E.2d 600, 611 (1991). "The value of the evidence need only be slight." *Id.* at 355, 402 S.E.2d at 610. In addition, the Supreme Court of North Carolina "has held that out-of-court statements offered to explain the conduct of a witness are relevant and admissible." *Id.* at 356, 402 S.E.2d at 611. "[E]ven though a trial

court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal." *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991), *appeal dismissed and disc. review denied*, 331 N.C. 290, 416 S.E.2d 398, *cert. denied*, 506 U.S. 915, 121 L. Ed. 2d 241 (1992).

Here, the detectives' questions were relevant. Their content made facts of consequence to this case more probable or less probable than they would be otherwise. The questions and their answers were relevant to facts under dispute. In addition, here, the questions gave context to defendant's responses. As discussed *infra*, during the course of questioning, defendant eventually conceded to the truth of many of the statements relayed to him via the detectives' questions. The circumstances under which these concessions were made were relevant to understanding the concessions themselves and therefore to the subject matter of the case. At other times, after being confronted with the purported statements of others via the detectives' questions, defendant changed his story substantially. In these instances, the questions were also relevant to explain and provide context to defendant's subsequent conduct of changing his story. In sum, the detectives' questions were clearly relevant.

### ii. Hearsay

[2] Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c). "However, out-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay." *State v. Call*, 349 N.C. 382, 409, 508 S.E.2d 496, 513 (1998). The Supreme Court of North Carolina "has held that statements of one person to another to explain subsequent actions taken by the person to whom the statement was made are admissible as nonhearsay evidence." *Id.* (citing *State v. Coffey*, 326 N.C. 268, 282, 389 S.E.2d 48, 56 (1990)). "The reason such statements are admissible is not that they fall under an exception to the rule, but that they simply are not hearsay [because] they do not come within the above legal definition of the term." *Long v. Paving Co.*, 47 N.C. App. 564, 569, 268 S.E.2d 1, 5 (1980). The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59-60 n.9, 158 L. Ed. 2d 177, 197-98 n.9 (2004). Our standard of review on this issue

is *de novo*. *See State v. Hazelwood*, 187 N.C. App. 94, 98, 652 S.E.2d 63, 66 (2007) ("The trial court concluded that this portion of Defendant's statement was not hearsay under Rule 801(c) because it was not offered for its truth. We review the trial court's determination *de novo*."), *cert. denied*, 363 N.C. 133, 673 S.E.2d 867 (2009).

Here, the trial court relied on *State v. Chapman* in ruling that the questions containing statements attributed to non-testifying third parties were admissible because they were not offered for their truth. 359 N.C. 328, 611 S.E.2d 794 (2005).

In *Chapman*, a testifying detective was permitted to read to the jury a statement made by the defendant during his police interview, which stated, *inter alia*, that " '[a]round noon, somebody called [the house where the defendant was at] and said they were going to kill whoever was in the house over [the victim's] death. [Defendant] then left and went to [Lee] Green's house.' " *Id.* at 355, 611 S.E.2d at 815. The Supreme Court of North Carolina concluded that the "words of the unidentified caller contained within defendant's statement to [the detective] [were] not hearsay because they were not offered to prove the truth of the matter asserted." *Id.*, 611 S.E.2d at 816. Specifically, the "[e]vidence of the phone call was admitted to show [the] defendant's response to receiving the call, not to prove that the caller would actually harm the people in [the] house." *Id.* Thus, that Court held that "the phone call was admissible to explain [the] defendant's subsequent conduct in leaving [the] house." *Id.*

Also, in *Chapman*, the trial court admitted the same detective's testimony regarding the contents of an interview in which the detective used the statements of others to elicit a response from a witness ("Green") who was with the defendant both at the time the murder occurred as well as when the aforementioned phone call was received. When Green was confronted with the purported statements of others during his second police interview, including that " 'there were statements made' " that Green was " 'aware of the shooting that occurred' ", Green " 'broke down' " and " 'told law enforcement a different story.' " *Id.* at 359-60, 611 S.E.2d at 818. The Court held that the testimony regarding what others said was not offered to prove the truth of the matter asserted; rather, "the central purpose . . . was to show Green's response to being caught in a lie during his second police interview." *Id* at 360, 611 S.E.2d at 818.

The *Chapman* case is applicable to the case *sub judice*. Here, the purported statements of co-defendants and others that were con-

tained in the detectives' questions were not offered to prove the truth of the matters asserted therein but to show the effect they had on defendant and his response. When the detectives confronted defendant with the aforementioned statements they allegedly received from others, defendant changed his story significantly. Indeed, when the detectives began questioning him, he denied all knowledge of the events that occurred at Owens's house and stated that he did not leave his residence on the night in question. However, upon being confronted with statements from others that implicated him, defendant admitted his presence at the scene, knowing about the plan to rob Owens, and that he went to Owens's house with the intent to rob him. In fact, each time defendant was confronted with statements of others, he changed his story a little bit more.

Furthermore, in the recorded interview defendant essentially admitted to the truth of every out-of-court statement with one exception. Specifically, defendant never admitted that he had a gun during the robbery. However, while defendant never admitted to possessing a gun at the scene, he did change his story significantly regarding the weapons when confronted with the questions containing the purported statements of Grady and Graham. Originally, defendant stated that only Grady possessed a firearm; however, upon being confronted with statements allegedly made by Grady and Graham that he did have a firearm, he changed his story to say that all of his co-defendants had firearms, but that he did not. In other words, here, the detectives' questions containing these purported statements had an immediately noticeable effect on defendant as the listener and caused him to change his story in such a way that his later statements became mutually exclusive of substantial parts of his earlier statements. Because defendant changed his story as a result of these out-of-court statements, it can be properly said that these questions were admitted to show their effect on defendant, not to prove the truth of the matter asserted. Moreover, given that defendant was convicted under the theory of acting in concert, defendant did not need to possess a gun in order to be found guilty of the charges for which he was accused, since he admitted that he knew that his co-defendants did have firearms.

Defendant relies extensively on *State v. Canady* to argue that the out-of-court statements constituted hearsay and were not admissible for any valid non-hearsay purpose. 355 N.C. 242, 559 S.E.2d 762 (2002). In that case, along with a series of other errors, the trial court admitted a detective's testimony regarding what a prison inmate told

him another inmate said about certain murders that the detective was investigating and about the defendant's role in them. *Id.* at 246, 559 S.E.2d at 764. The State argued that the detective's testimony as to what he heard from the inmate served "to show the [detective's] conduct after he received the information" and therefore, was not hearsay. *Id.* The trial court also instructed the jury to not consider the out-of-court statements for the truth of the matter asserted. *Id.*

However, *Canady* is distinguishable from the instant case. There, the Supreme Court of North Carolina essentially found that the State's proffered purpose for using this testimony, i.e., to explain the detective's "subsequent actions", did not reflect the actual use of the statements made by the State at trial:

> [T]he State's closing argument confirms that the State did not use [the detective's] statement merely as an explanation of subsequent actions. Instead, the State relied on [the detective's] testimony as substantive evidence of the details of the murders and to imply [the] defendant had given a detailed confession of his alleged crimes. By using [the detective's] testimony in this manner, the State undoubtedly sought to prove the truth of the matter asserted. Accordingly, the testimony at issue was inadmissible hearsay. Moreover, despite the trial court's provision of a limiting instruction, we hold [the detective's] testimony went so far beyond the confines of this instruction that the jury could not reasonably have restricted its attention to any nonhearsay elements in [the detective's] testimony.

*Id.* at 249, 559 S.E.2d at 766. In fact, the prosecutor in that case based his central theory of the case on the out-of-court statements and cited facts from those statements in closing argument. Here, the prosecution did not use the out-of-court statements to build its case, nor did it reference them in closing argument. Rather, the State offered these statements for a valid nonhearsay purpose and used them for that same purpose.

In sum, the questions containing alleged statements of non-testifying individuals were admissible so that the jury could understand the circumstances in which the defendant was caught in a lie, changed his story, and made significant admissions of fact, not to prove the truth of the matter asserted. Because this "evidence [was] admitted for a purpose other than the truth of the matter asserted, the protection afforded by the Confrontation Clause against testimonial

statements is not at issue" here, and the admission of these questions did not violate defendant's state and federal confrontation rights. *State v. Walker*, 170 N.C. App. 632, 635, 613 S.E.2d 330, 333, *disc. review denied*, 359 N.C. 856, 620 S.E.2d 196 (2005). Accordingly, we overrule these assignments of error.

### iii. Failure to Exercise Discretion and Rule 403

**[3]** Defendant next argues that the trial court violated N.C. Gen. Stat. § 8C-1, Rule 403 by: (1) completely failing to exercise its discretion because it did not view the DVD before ruling on its admissibility; and (2) refusing to redact the aforementioned questions. These arguments are without merit.

Relevant "evidence may [still] be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403: "Whether to exclude relevant evidence under N.C.G.S. § 8C-1, Rule 403 is in the trial court's discretion; we review the trial court's decision for an abuse of that discretion." *State v. Sims*, 161 N.C. App. 183, 190, 588 S.E.2d 55, 60 (2003). "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Wilson*, 313 N.C. 516, 538, 330 S.E.2d 450, 465 (1985). "In determining whether to exclude evidence on the grounds of undue prejudice, the trial court should consider 'the probable effectiveness or lack of effectiveness of a limiting instruction.' " *Reis v. Hoots*, 131 N.C. App. 721, 727, 509 S.E.2d 198, 203 (1998) (quoting Fed. R. Evid. 403 advisory committee's note), *disc. review denied*, 350 N.C. 595, 537 S.E.2d 481 (1999).

> [Where] the trial judge [gives] a limiting instruction with regard to the evidence in dispute, it follows that he recognized the potential for prejudice and exercised his discretion in permitting its introduction. This Court will not intervene where the trial court properly appraises the probative and prejudicial values of evidence under Rule 403.

*Id.*

In support of his argument that the trial court completely failed to exercise its discretion, defendant principally relies on *State v. Ashe*, 314 N.C. 28, 331 S.E.2d 652 (1985) and *State v. Lang*, 301 N.C. 508, 272 S.E.2d 123 (1980). However, these cases are inapposite to the

instant case. In both *Ashe* and *Lang*, the Supreme Court of North Carolina addressed whether the respective trial judges had failed to exercise their discretion by denying a jury request to review the testimony of an alibi witness when said request was made subsequent to the respective juries retiring for deliberation. *Ashe*, 314 N.C. at 33, 37, 331 S.E.2d at 656; *Lang*, 301 N.C. at 510-11, 272 S.E.2d at 124-25. In both cases, the Court concluded that the respective trial judges' responses indicated that they erroneously believed that they did not have the discretion to grant the juries' requests and thus erroneously failed to exercise their discretion. *Ashe*, 314 N.C. at 35, 331 S.E.2d at 656-57; *Lang*, 301 N.C. at 510-11, 272 S.E.2d at 124-25. Further, the respective errors were prejudicial because they implicated the only defense raised by the respective defendants, i.e., an alibi. *Ashe*, 314 N.C. at 37, 331 S.E.2d at 657-58; *Lang*, 301 N.C. at 511, 272 S.E.2d at 125.

Neither *Ashe* nor *Lang* stand for the proposition that a trial court's decision to not physically view evidence before admitting it constitutes an absolute failure to exercise discretion. Furthermore, we believe that a close review of the record indicates that the trial court did exercise its discretion here by questioning the parties regarding the content of the recorded statements and the objections to that content. Specifically, the court asked both parties to provide a forecast of what was contained in the DVD and made its ruling based on said forecasts. Defendant does not assert that the forecasts were inaccurate, and our review of the transcript and the DVD lead us to conclude that said forecasts were accurate. Furthermore, given that the trial court gave "a limiting instruction with regard to the evidence in dispute, it follows that he recognized the potential for prejudice and exercised his discretion in permitting its introduction." *Reis*, 131 N.C. App. at 727, 509 S.E.2d at 203. Accordingly, we overrule this assignment of error.

**[4]** Next, defendant argues the trial court should have redacted the questions containing purported statements made by non-testifying witnesses because any probative value "was vastly outweighed by its unfairly prejudicial effect" and violated Rule 403. Based on the record here, we disagree.

In the case *sub judice*, the trial court heard counsels' respective arguments on the possible probative and prejudicial effect of the content of the DVD, took relevant case law into consideration, listened to counsels' respective forecasts as to what was contained in the DVD, and determined that redacting the detectives' questions from the DVD

would serve to confuse the jury The court also instructed the jury as follows:

> The Court did review the last portion of this exhibit, State's Exhibit 67, which had been identified as a copy of the DVD or interrogation of the defendant . . . . I want to give you an instruction about that. That is the statements of the officer in this interrogation that [Graham] or [Grady] or [Bowser] or others said things about what happened on January 23, 2006, or said things about what the defendant did, those statements are not being offered for the truth of the matter asserted within those statements. They are offered for a limited purpose, that is as statements by the officer or officers to invite a response by the defendant and to explain the officer's conduct and the defendant's conduct during the investigation. To the extent they do so, you may consider them but may not consider them for the truth as they are not offered or received in evidence for that purpose[.]

Courts "presume 'that jurors . . . attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.' " *State v. Jennings*, 333 N.C. 579, 618, 430 S.E.2d 188, 208 (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 360 n.9 (1985)), *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). We believe this instruction is sufficiently clear as to how the jury was to treat the statements attributed to non-testifying third parties that were contained in the detectives' questions, and defendant did not object to this instruction or its content. Furthermore, the questions to which defendant objected comprised but a small portion, (less than one minute total), of defendant's approximately one-hour interview. The vast majority of them were posed at the beginning of the interview and resulted in defendant changing his original story substantially. Accordingly, it cannot be said that the trial court's decision not to redact the questions was " 'manifestly unsupported by reason.' " *State v. T.D.R.*, 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998) (quoting *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 832 (1985)).

While we believe that publishing the recorded interview to the jury did not constitute error here, we nevertheless encourage trial courts to review the content of recorded interviews before publishing them to the jury to ensure that all out-of-court statements contained therein are either admissible for a valid nonhearsay purpose or as an exception to the hearsay rule in order to safeguard against an end-run

around the evidentiary and constitutional proscriptions against the admission of hearsay. Further, we would like to remind trial courts that the questions police pose during suspect interviews may contain false accusations, inherently unreliable, unconfirmed or false statements, and inflammatory remarks that constitute legitimate points of inquiry during a police investigation, but that would otherwise be inadmissible in open court. As such, the wholesale publication of a recording of a police interview to the jury, especially law enforcement's investigatory questions, might very well violate the proscriptions against admitting hearsay or Rule 403. In such instances, trial courts would need to redact or exclude the problematic portions of law enforcement's investigatory questions/statements.

## B. Plain Error and Jury Instructions

Next, defendant contends that the trial court's "instructions on acting in concert in conjunction with attempted armed robbery, [first degree] burglary, and felony murder were prejudicially confusing, ambiguous, and incorrect as a matter of law because they permitted the jury to convict [him] of [these respective crimes based] upon a factually and legally impossible state of facts."[4] We disagree.

Defendant did not object to the jury instructions at trial. Jury instructions to which a defendant did not object are reviewed for plain error. *State v. Goforth*, 170 N.C. App. 584, 587, 614 S.E.2d 313, 315, *cert. denied*, 359 N.C. 854, 619 S.E.2d 854 (2005).

> "[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a '*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused,' or the error ' "resulted in a miscarriage of justice or in the denial to appellant of a fair trial" ' or where the error is such as to 'seriously affect the fairness, integrity or public reputation of judicial proceedings' or where it can be fairly said 'the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.' "

---

4. Defendant also contends that the trial court erred in its instructions on acting in concert with respect to attempted common-law robbery, second degree burglary, and felonious breaking or entering. However, defendant was not convicted of these offenses; thus, it is unclear how these instructions, even if erroneous, could have prejudiced him.

*State v. Odom,* 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill,* 676 F. 2d 995, 1002 (4th Cir.), *cert. denied,* 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). "The adoption of the 'plain error' rule does not mean that every failure to give a proper instruction mandates reversal regardless of the defendant's failure to object at trial." *Id.* "Indeed, . . . '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " *Id* at 660-61, 300 S.E.2d at 378 (quoting *Henderson v. Kibbe,* 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212 (1977)).

Furthermore, even if an instruction does contain technical errors,

a charge [to the jury] shall be considered as a whole in the same connected way in which it was given, and on the presumption that the jury did not overlook any portion of it, and, when so taken, it "fairly and correctly presents the law, it will afford no ground for reversing the judgment, even if an isolated expression should be found technically inaccurate."

*State v. Valley,* 187 N.C. 571, 572, 122 S.E. 373, 373-74 (1924) (quoting *State v. Dill,* 184 N.C. 645, 650, 113 S.E. 609, 612 (1922)).

i. Attempted Robbery with a Firearm

[5] Defendant argues that the trial court committed plain error because its instructions on attempted robbery with a firearm and acting in concert essentially informed the jury that it could convict him of attempted robbery with a firearm based on his shared purpose or intent to commit an attempt rather than a shared purpose or intent to commit the completed substantive offense. We disagree.

Defendant concedes that the trial court correctly instructed the jury on the intent element of robbery with a firearm. After instructing the jury on the requisite elements for robbery with a firearm, the trial court then proceeded to give the following instruction on acting in concert:[5]

Now for a person to be guilty of a crime it is not necessary that he personally do all of the acts necessary to constitute the crime. If two or more persons join in a common purpose to com-

---

5. We note that this instruction is nearly a verbatim statement of N.C.P.I.—Crim. 202.10 (June 2006). The only significant difference is that, here, the instruction refers to the specific crime of robbery with a firearm.

it robbery with a firearm, each of them if actually or constructively present is guilty of that crime if the other person commits the crime and also guilty of any other crime committed by the other in pursuance of the common purpose to commit robbery with a firearm or as a natural or probable consequence thereof.

With regard to the intent element of attempted robbery with a firearm the trial court stated:

Now, attempted robbery with a firearm is attempting to rob another by endangering or threatening him with a firearm. For you to find the defendant guilty of this offense, the State must prove . . . *that the defendant intended to rob a person,* that is to take and carry away personal property from that person or in his presence without his consent knowing that he, the defendant, was not entitled to take it, intending to deprive that person of its use permanently. . . . The instructions I have given you previously concerning acting in concert with another person or persons are equally applicable here and you should consider them here.

(Emphasis added). The trial court further instructed:

So if you find from the evidence beyond a reasonable doubt that on or about the alleged date, the defendant acting by himself or acting together with another person or persons *intended to rob a person, and that in furtherance of this intent, he possessed a firearm which he used in such a manner as to endanger or threaten the life of that person and if this was an act designed to bring about the robbery and which in the ordinary course of things would have resulted in robbery had it not been stopped or thwarted,* it would be your duty to return a verdict of guilty of attempted robbery with a firearm.

(Emphasis added). The italicized portions of these instructions are clear that in order to find defendant guilty of attempted robbery with a firearm, the jury had to find that he "intended to rob a person". In other words, the court instructed the jury that it had to find that defendant had the intent to commit the completed substantive offense, not merely the intent to commit an attempt. Furthermore, the italicized portion of the latter instruction is clear that the only real difference between robbery with a firearm and attempted robbery with a firearm is that with the former, a defendant, or someone with whom he is acting in concert, is successful in taking and carrying away the victim's property, but with the latter he is not.

Accordingly, we do not believe the court committed error, much less plain error, in instructing the jury on attempted robbery with a firearm and the theory of acting in concert.

### ii. First Degree Burglary

**[6]** Defendant also contends that the trial court "committed a similar error in instructing on first-degree burglary and its lesser included offenses." As discussed *infra,* while we believe that some of the instructions on first degree burglary were a bit confusing and technically incorrect, we do not believe they rise to the level of plain error. The trial judge instructed the jury on first degree burglary as follows: "The defendant has been charged with first degree burglary, which is breaking and entering the occupied dwelling of another without his consent in the nighttime *with the intent to commit robbery or attempted robbery.*" (Emphasis added). Later, in instructing the jury on the intent element, the court stated that the jury had to find that "at the time of the breaking and entering, the defendant intended to commit robbery with a firearm *or attempted robbery with a firearm* or common law robbery or *attempted common law robbery.*" (Emphasis added). Finally, in instructing the jury on acting in concert and first degree burglary, the court stated:

> So if you find from the evidence beyond a reasonable doubt that . . . defendant acting either by himself or acting together with another person or other persons broke into and entered an occupied dwelling house without the tenant's consent during the nighttime and at that time intended to commit robbery with a firearm, *attempted robbery with a firearm* or common law robbery or *attempted common law robbery,* it would be your duty to return a verdict of guilty of first degree burglary.

(Emphasis added). The italicized portions of these instructions do appear to inform the jury that it could convict defendant based on his intent to commit an attempt. However, the trial court also specifically referred the jury back to its previous instructions on, *inter alia,* the elements of attempted armed robbery and attempted common law robbery: "The instructions I have given you previously about the definition and the elements of the offense of robbery with a firearm, attempted robbery with a firearm, common law robbery, and attempted common law robbery are equally applicable here and you are directed to consider those instructions here." Both the instructions on attempted robbery with a firearm and attempted common

law robbery were correct.[6] The instructions on the intent element of those crimes make it clear that defendant must have "intended to rob a person" by using a firearm or "intended to commit common law robbery" for him to be convicted of first degree burglary.

Here, the instructions, when taken as a whole, are sufficiently clear to inform the jury that in order to find defendant guilty of first degree burglary, defendant actually had to have the intent to commit the completed crime, not merely the intent to commit an attempt, and that the difference between the completed crimes of robbery with a firearm and common law robbery and the crimes of attempted robbery with a firearm and attempted common law robbery, is a defendant's success or lack thereof in obtaining the property. Hence, although the instruction on first degree burglary does contain technically confusing and erroneous language, we find that on the whole, the instructions fairly and correctly presented the law and do not rise to the level of plain error.

### iii. Felony Murder

[7] Defendant also argues that the instructions on acting in concert in connection with felony murder were erroneous. The trial court gave the jury the following instruction on acting in concert in the context of felony murder:

> Now for a person to be guilty of a crime it is not necessary that he personally do all of the acts necessary to constitute the crime. *If two or more persons join in a common purpose to commit first degree murder based on the felony murder rule,* each of them if actively or constructively present is guilty of that crime if the other person commits the crime and also guilty of any other crime committed by the other *in pursuance of a common purpose to commit first degree murder based on the felony murder rule* or as a natural or probable consequence thereof.

(Emphasis added). Defendant correctly points out that this instruction is technically erroneous, as "first degree murder based on the felony murder rule" is not one of the underlying felonies that sup-

---

6. The trial court instructed the jury that to find defendant guilty of attempted common law robbery, the State had to prove "defendant intended to commit common law robbery . . . [and] at the time the defendant had this intent, he performed an act which was calculated and designed to bring about common law robbery, but which fell short of the completed offense and which came so close to bringing it about that in the ordinary and likely course of things, he would have completed that crime had he not been stopped or prevented from completing his apparent course of action."

ports first degree felony murder. However, the trial court's later instructions served to eliminate all possibility of error or confusion. The trial court instructed the jury that robbery with a firearm, attempted robbery with a firearm, common law robbery, attempted common law robbery, first degree burglary, or second degree burglary were the possible underlying felonies upon which a felony murder conviction could be predicated. Although the trial court did make an inadvertent misstatement which seemed to indicate "first degree murder based on the felony murder rule" could also serve as an underlying felony upon which a conviction of felony murder could be based, the court's subsequent instructions were sufficiently clear that it was not. Moreover, the verdict sheets provided to the jury clearly and correctly stated the underlying felonies that could support a conviction for felony murder. As such, we do not believe the trial court's initial misstatement rises to the level of plain error.

### III. Conclusion

In sum, after careful review of defendant's arguments in this case, we find no error.

No error.

Judges WYNN and ERVIN concur.