IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-87

No. 303A21

Filed 15 July 2022

IN THE MATTER OF: J.D.O., J.D.O., & J.D.O.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from an order entered on 27 May 2021 by Judge Gregory A. Bullard in District Court, Robeson County. This matter was calendared for argument in the Supreme Court on 1 July 2022 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*J. Edward Yeager Jr. for petitioner-appellee Robeson County Department of Social Services.*

*Laura K. Greene for appellee Guardian ad Litem.*

*Benjamin J. Kull for respondent-appellant mother.*

MORGAN, Justice.

¶ 1 Respondent-mother appeals from the trial court's order which terminated her parental rights to the minor children Johnny, Janelle, and Joel.[1] The order also terminated the parental rights of the alleged putative father of the children and the parental rights of any unknown father. There is no father who is a party to this appeal.

---

[1] Pseudonyms have been utilized in lieu of the actual names of the children in order to protect their identities and for ease of reading.

On appeal, respondent-mother challenges the trial court's determination of the existence of grounds to terminate her parental rights to the juveniles under N.C.G.S. § 7B-1111(a)(1)–(3). She argues that the adjudication is unsupported by the evidence received by the trial court at the termination of parental rights hearing and that the trial court's findings of fact are insufficient to support the establishment of grounds to terminate her parental rights to the three juveniles. Based on our conclusion that the trial court's adjudication of neglect under N.C.G.S. § 7B-1111(a)(1) is supported by clear, cogent, and convincing evidence, which in turn supports the findings of fact included in the termination of parental rights order addressing the ground of neglect, we affirm the trial court's termination of respondent-mother's parental rights.

## I.    Factual and Procedural Background

On the evening of 7 December 2018, Robeson County Department of Social Services (DSS) obtained nonsecure custody of respondent-mother's six children, including Johnny, Janelle, and Joel, after receiving multiple reports of respondent-mother's extensive drug use. DSS filed juvenile petitions on 10 December 2018 alleging that Johnny, Janelle, and Joel were neglected juveniles because they did not receive proper care, supervision, or discipline from their parents and lived in an environment which was injurious to their welfare. The petitions recounted the circumstances of respondent-mother's illegal drug use which were referenced in reports received by DSS on 25 October 2018 and 7 December 2018, including

information that respondent-mother tested positive for cocaine when she was admitted to the hospital to give birth to her infant son Liam, who also tested positive for Suboxone[2] and cocaine; that respondent-mother "had not had any prenatal care during her pregnancy with [Liam] but had been to the emergency room while pregnant on different occasions and tested positive for cocaine, benzos, and oxycodone"; that respondent-mother overdosed on Suboxone and Neurontin on 7 December 2018 and was found unconscious in her car at a gas station while Liam and another child were in the vehicle with her; that respondent-mother "was not alert" when she was admitted to the hospital for the 7 December 2018 overdose; and that Emergency Medical Services (EMS) was previously called to the home of the mother of respondent-mother in September 2016 after respondent-mother had overdosed on controlled substances. The petitions further alleged that DSS had been involved with the family since February 2012 due to multiple neglect referrals spawned by respondent-mother's substance abuse.

¶ 4 DSS's petitions were presented at a hearing on 4 April 2019, after which the trial court entered an order on 16 July 2019 adjudicating the six children to be neglected juveniles. The trial court made several findings of fact in its order which

---

[2] Suboxone is a brand name for sublingual buprenorphine, a drug used to treat opioid use disorders by preventing withdrawal symptoms caused by cessation of opioid use. *Buprenorphine*, Substance Abuse and Mental Health Servs. Admin., https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions/buprenorphine (last updated Apr. 21, 2022).

addressed the accounts that had been reported to the assigned DSS social worker, Miranda Wilkins, by various sources. The trial court determined that respondent-mother "neither admits nor denies the allegations . . . but does not oppose a finding of neglect." The trial court's dispositional order maintained the children in DSS custody and directed the agency to continue its efforts toward reunification of respondent-mother with the children. Further, the trial court determined that respondent-mother needed to complete substance abuse and mental health assessments and to follow the recommendations resulting from those evaluations. The tribunal likewise decided that respondent-mother must obtain housing and employment.

¶ 5     In its initial permanency planning order entered in this case on 29 October 2019, the trial court established a primary permanent plan of reunification with a concurrent plan of adoption. The trial court found that respondent-mother was attending substance abuse treatment at RAPHA Healthcare Services but "ha[d] not made any progress on" other components of her case plan. In a subsequent permanency planning order entered on 7 April 2020, the trial court maintained the primary plan for Johnny, Janelle, and Joel as adoption with a concurrent plan of reunification, but encouraged DSS to "primarily focus" on the plan of adoption. The trial court found that "[n]one of the parents have made substantial progress at eliminating the issues that brought the children into care" and that respondent-

mother "was receiving substance abuse treatment at RAPHA, but she no longer attends RAPHA. The mother is pregnant and has entered Our House."

¶ 6        DSS filed a petition to terminate respondent-mother's parental rights to Johnny, Janelle, and Joel on 28 April 2020, alleging that grounds existed to terminate respondent-mother's parental rights because (1) she had failed to make reasonable progress to correct the conditions which had precipitated the removal of the juveniles from her care within the meaning of N.C.G.S. § 7B-1111(a)(2); (2) she had neglected the juveniles within the meaning of N.C.G.S. § 7B-101(15); and (3) she had willfully failed, for a continuous period of six months immediately preceding the filing of the petition, to pay a reasonable portion of the cost of care for the juveniles although physically and financially able to do so within the meaning of N.C.G.S. § 7B-1111(a)(3). Following hearings conducted on 29 April 2021 and 17 May 2021, the trial court entered an order terminating respondent-mother's parental rights to the three children on 27 May 2021. As its statutory grounds for termination, the trial court concluded that respondent-mother had previously neglected the children as evidenced by the trial court's 2019 adjudication and that there existed the likelihood of future, repeated neglect if the children were returned to her care, *see* N.C.G.S. § 7B-1111(a)(1) (2021); that respondent-mother had willfully left the children in a placement outside the home for more than twelve months without making reasonable progress to correct the conditions leading to the removal of the children from

respondent-mother's care, *see* N.C.G.S. § 7B-1111(a)(2); and that respondent-mother willfully failed to pay a reasonable portion of the children's cost of care, although physically and financially able to do so, for the six months immediately preceding the filing of the petition to terminate her parental rights on 28 April 2020[3], *see* N.C.G.S. § 7B-1111(a)(3). The trial court further concluded that it was in the best interests of Johnny, Janelle, and Joel that respondent-mother's parental rights be terminated. *See* N.C.G.S. § 7B-1110(a) (2021).

¶ 7 Respondent-mother filed timely notice of appeal from the termination of parental rights order. *See* N.C.G.S. § 7B-1001(a1)(1) (2019).

## II. Analysis

### A. Subject matter jurisdiction

¶ 8 Respondent-mother first claims that the trial court's order terminating her parental rights is void for lack of subject matter jurisdiction because the trial court failed to make written findings of fact to establish the basis for its jurisdiction under N.C.G.S. § 7B-1101. While respondent-mother acknowledges that this Court rejected an identical challenge to the trial court's jurisdiction in *In re K.N.*, 378 N.C. 450, 2021-

---

[3] We note that the petition to terminate respondent-mother's parental rights in this matter filed on 28 April 2020 asserted only that "the alleged father" had failed to pay the reasonable cost of care for the children as a subsection within a larger allegation setting forth the proposed grounds for terminating the parental rights of respondent-mother. Ultimately, this discrepancy between the allegation in the petition and the trial court's finding of the existence of the ground under N.C.G.S. § 7B-1111(a)(3) is immaterial to the disposition of this case.

NCSC-98, she "respectfully submits that [*In re*] *K.N.* was wrongly decided on this issue."

Section 7B-1101 provides as follows:

> The [trial] court shall have exclusive original jurisdiction to hear and determine any petition or motion relating to termination of parental rights to any juvenile who resides in, is found in, or is in the legal or actual custody of a county department of social services or licensed child-placing agency in the district at the time of filing of the petition or motion. . . . Provided, that before exercising jurisdiction under this Article, the court shall find that it has jurisdiction to make a child-custody determination under the provisions of G.S. 50A-201, 50A-203, or 50A-204.

N.C.G.S. § 7B-1101 (2021); *see also* N.C.G.S. § 7B-101(6) (2021) (defining "[c]ourt" as "[t]he district court division of the General Court of Justice").

Because the trial court made no express finding that it had jurisdiction to make a child custody determination under N.C.G.S. §§ 50A-201, 50A-203, or 50A-204, respondent-mother contends that "it could not properly exercise jurisdiction to conduct the termination proceeding or enter the resulting order." In *In re K.N.*, this Court considered the fact-finding requirements of N.C.G.S. § 7B-1101 and held that "[t]he trial court is not required to make specific findings of fact demonstrating its jurisdiction under the UCCJEA,[4] but the record must reflect that the jurisdictional

---

[4] Sections 50A-201, -203, and -204 of our General Statutes are part of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). *See* N.C.G.S. §§ 50A-201, -203, -204 (2021).

prerequisites of the Act were satisfied when the court exercised jurisdiction." *In re K.N.*, ¶ 21 (first alteration in original) (quoting *In re L.T.*, 374 N.C. 567, 569 (2020)). We reaffirmed this principle in *In re M.S.L.*, 380 N.C. 778, 2022-NCSC-41, concluding as follows:

> Here the trial court stated that it "has jurisdiction over the parties and the subject matter of this action." The record here supports the trial court's finding and a conclusion that the trial court had both subject matter and personal jurisdiction in this case. Given that Monica resided in North Carolina since her birth, North Carolina is her "home state." . . . Thus, because the trial court's finding and the record support a conclusion that the trial court had subject matter jurisdiction here, respondent's argument is overruled.

*Id.* ¶ 16 (citing *In re K.N.*, ¶¶ 18–22).

¶ 11 The record before us shows that Johnny, Janelle, and Joel were born in North Carolina and resided in North Carolina for more than six consecutive months immediately preceding DSS's initiation of both the original juvenile proceedings in December 2018 and the termination of parental rights proceedings in April 2020. North Carolina therefore was established statutorily to be the juveniles' "home state" as defined by N.C.G.S. § 50A-102(7), which governs a trial court's authority to exercise jurisdiction to make an initial child custody determination under N.C.G.S. § 50A-201(a)(1). *See* N.C.G.S. § 50A-102(7) (2021).

¶ 12 Similar to the trial court's establishment of jurisdiction which was approved by this Court in *In re M.S.L.*, the trial court's order in the present case included a

determination "[t]hat the [c]ourt has jurisdiction over the parties and subject matter herein pursuant to Article 11 of Chapter 7B of the North Carolina General Statutes." Since N.C.G.S. § 7B-1101 does not require any additional findings to support the trial court's exercise of jurisdiction, respondent-mother's argument is overruled. *See In re M.S.L.*, ¶ 16.

## B. Adjudication under N.C.G.S. § 7B-1111(a)

Respondent-mother next claims that the trial court erred in its determination of the existence of grounds for termination of her parental rights pursuant to N.C.G.S. § 7B-1111(a)(1)–(3) in its termination order. In addressing her arguments, we employ the following standard of review:

> We review the trial court's adjudication under N.C.G.S. § 7B-1111(a) to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. Unchallenged findings of fact are deemed supported by competent evidence and are binding on appeal. Moreover, we review only those findings needed to sustain the trial court's adjudication.
>
> The issue of whether a trial court's findings of fact support its conclusions of law is reviewed de novo. However, an adjudication of any single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will suffice to support a termination order. Therefore, if this Court upholds the trial court's order in which it concludes that a particular ground for termination exists, then we need not review any remaining grounds.

*In re J.I.G.,* 380 N.C. 747, 2022-NCSC-38, ¶ 8 (extraneity omitted) (quoting *In re*

*B.J.H.*, 378 N.C. 524, 2021-NCSC-103, ¶ 11).

¶ 14        Before presenting her stance on the substantive content of various findings of fact reached by the trial court, respondent-mother characterizes the trial court's adjudicatory findings as "riddled with inexplicable errors" impacted by the trial court's evidentiary rulings. Respondent-mother submits that the trial court made a series of findings purporting to rely upon documents contained in the juvenile case file and designated as Exhibits L through S, which "were never offered or accepted into evidence during [the termination] hearing." (Emphasis omitted.) Respondent-mother also challenges the trial court's finding that it "took judicial notice of the entire underlying court file[,]" which contradicts the trial court's oral ruling at the hearing that it would only take judicial notice of the 2019 adjudication order. Respondent-mother also claims that the trial court made "irreconcilably confusing" rulings about the admissibility of Exhibits K and K1, which are two case timelines prepared by DSS social workers that respondent-mother argues contained inadmissible hearsay.

¶ 15        DSS concedes that "there are numerous elements within the termination order which simply cannot be explained given the transcript and the current record." DSS opines that these discrepancies may be attributed to the video-conferencing technology that was used to conduct the termination of parental rights hearing remotely, suggesting that the assorted instances where the proceedings are

transcribed as "inaudible"[5] indicate the additional "possib[ility] that some portions [of the hearing] were not captured through the recording." Notwithstanding any inconsistencies or errors in the trial court's evidentiary rulings, DSS asserts that "there is sufficient competent evidence to support this Court affirming the termination order."

¶ 16        Our appellate courts have consistently held that a trial court may take judicial notice of the underlying juvenile case file at a hearing on a termination of parental rights petition. *E.g., In re T.N.H.*, 372 N.C. 403, 408 (2019) ("[T]he trial court in this case relied partly on evidence from prior proceedings and findings in earlier orders, which . . . is proper and appropriate."); *In re M.N.C.*, 176 N.C. App. 114, 120 (2006) ("This [c]ourt has held '[a] trial court may take judicial notice of earlier proceedings in the same cause' and that it is not necessary for either party to offer the file into evidence." (alteration in original) (quoting *In re Isenhour*, 101 N.C. App. 550, 553 (1991))); *see also In re J.K.F.*, 379 N.C. 247, 2021-NCSC-137, ¶ 22 & n.2 (upholding adjudicatory finding based on a document admitted at a prior review hearing, while noting that "[t]he trial court took 'judicial notice of all orders, court reports, attachments to court reports, and other documents contained in the underlying juvenile files' "). We have qualified this standard with the principle that "the trial

---

[5] A search of the 340-page hearing transcript yields 692 instances of the term "inaudible."

court may not rely solely on prior court orders and reports but must receive some oral testimony at the hearing and make an independent determination regarding the evidence presented." *In re T.N.H.*, 372 N.C. at 410. Furthermore, "[g]enerally, where a trial court's ruling rendered in open court is inconsistent with its written order, the written order controls." *In re M.R.F.*, 378 N.C. 638, 2021-NCSC-111, ¶ 4 n.2 (citing *In re A.U.D.*, 373 N.C. 3, 9–10 (2019)).

¶ 17        The termination hearing transcript shows that DSS asked the trial court "to take judicial notice of the prior JA file, the prior adjudication order that is in the JA file, . . . along with the findings in that file." Both respondent-parents objected to the trial court's exercise of judicial notice to be utilized in this manner. After a bench conference, the trial court directed DSS's counsel to "restate [DSS's] request of the [c]ourt in terms of what . . . you're asking the [c]ourt to take judicial notice of." DSS, through its counsel, then asked the trial court to take judicial notice of the tribunal's 2019 adjudication of neglect and the findings included in the adjudication order. In overruling the parents' objections at the termination of parental rights hearing, the trial court announced its intention to "take judicial notice of the order of adjudication in these matters and the facts and findings made therein." Later in the hearing, however, the trial court announced that it had taken judicial notice of the entire

juvenile case file.[6] The termination of parental rights order includes a finding that the trial court took "judicial notice of the underlying Juvenile File."[7]

¶ 18     The termination of parental rights order also includes eight findings in which the trial court "relies on and accepts into evidence" DSS Exhibits L through S, which are the following documents:

> Exhibit L: Respondent-mother's comprehensive clinical assessment from Southeastern Integrated Care, dated 6 October 2020;
>
> Exhibit M: The father's comprehensive clinical assessment from Southeastern Integrated Care, dated 6 October 2020;
>
> Exhibit N: Results from the father's drug screens and certificates of completion for substance abuse classes and parenting classes from Southeastern Integrated Care;
>
> Exhibit O: Respondent-mother's drug screens and certificates of completion for substance abuse classes and parenting classes from Southeastern Integrated Care;
>
> Exhibit P: Respondent-mother's drug screens from RAPHA Healthcare Services;
>
> Exhibit Q: Letter from Brittany Locklear, MSW LCAS-A, a

---

[6] As respondent-mother observes, in rendering its ruling at the conclusion of the adjudicatory stage of the termination hearing, the trial court stated that it had "take[n] judicial notice of the adjudication from April 3rd, 2019." Although this statement does not preclude the trial court from also taking judicial notice of the complete case file, the statement demonstrates the inconsistency in the trial court's oral pronouncements.

[7] Respondent-mother also challenges the trial court's decision to take "judicial notice of . . . [DSS's] efforts to work with" her. She argues that "[s]uch 'facts' are obviously well-beyond the scope of the relevant Rule of Evidence" because they are subject to reasonable dispute. *See* N.C.G.S. § 8C-1, Rule 201(b) (2021). Because we deem respondent-mother's position to harbor some degree of merit and because this challenged finding is not "needed to sustain the trial court's adjudication[,]" *In re J.I.G.*, 380 N.C. 747, 2022-NCSC-38, ¶ 8, we shall disregard it for purposes of our review.

> substance abuse therapist at Southeastern Integrated Care, vouching for the parents' "progress on their parenting skills and mental health goals";
>
> Exhibit R: Respondent-mother's Family Services Agreement with DSS; and
>
> Exhibit S: DSS placement logs for Johnny, Janelle, and Joel.

Although none of these documents were admitted into evidence, or even tendered for admission into evidence during the termination of parental rights hearing,[8] respondent-mother acknowledges that they were part of the juvenile case file. Additionally, as we later explain, respondent-mother does not identify any substantive finding by the trial court in the termination of parental rights order that is based exclusively on the contents of Exhibits L through S to the exclusion of witness testimony presented at the hearing. Furthermore, respondent-mother fails to identify any evidentiary conflict which these exhibits were utilized to resolve by the trial court. In sum, respondent-mother fails to establish that she was prejudiced by the trial court's consideration of these documents which were indisputably included in the juvenile case file.

¶ 19        We conclude that the trial court's oral rulings regarding the original parameters of its employment of judicial notice were superseded by its written

---

[8] It appears that DSS offered Exhibit L into evidence at a permanency planning hearing which was conducted immediately after the conclusion of the termination of parental rights hearing.

findings which effectively took judicial notice of all documents in the juvenile case file, including Exhibits L through S. *See In re M.R.F.*, ¶ 4 n.2. Accordingly, to the extent that respondent-mother objects to the trial court's act of "accept[ing] into evidence" Exhibits L through S, respondent-mother's arguments are unpersuasive.

¶ 20    Respondent-mother's contentions regarding the trial court's "irreconcilably confusing" rulings on Exhibits K and K1—the case timelines documented by DSS social workers—are likewise unconvincing.[9] Although the trial court made oral rulings purporting to receive these exhibits into evidence, respondent-mother asserts that the trial court's written findings indicate a contrasting outcome, which is "that the court did not actually accept [these exhibits] into evidence at all."

¶ 21    Given that the trial court's written rulings control, and that the trial court's written findings which determined the inadmissibility of Exhibits K and K1 comport with respondent-mother's position on the inadmissibility of these exhibits, respondent-mother does not show error based upon the trial court's oral rulings. *In re S.D.C.*, 381 N.C. 152, 2022-NCSC-55, ¶ 13. Respondent-mother fails to show that the trial court relied upon the DSS timelines contained in Exhibits K and K1 rather

---

[9] Exhibit K, titled "Termination of Parental Rights Adjudication Hearing," recounts DSS's involvement with the parents and their children, as well as the parents' participation in services and the course of the juvenile court proceedings between February 2012 and October 2020. Exhibit K1, titled "Termination of Parental Rights Disposition Hearing," provides a similar chronology of DSS interactions with the parents and the parents' progress in the case from May 2020 to April 2021.

than witness testimony in making any substantive findings of fact.[10] *Cf. In re I.E.M.*, 379 N.C. 221, 2021-NCSC-133, ¶ 16 ("Respondent-mother has failed to identify any inadmissible hearsay evidence upon which the trial court erroneously relied in the course of making the findings of fact contained in its termination order and has failed, for that reason, to establish that the trial court erred by considering the timeline in deciding that respondent-mother's parental rights in [the juvenile] were subject to termination.").

¶ 22    Respondent-mother further contends that the trial court's substantive findings of fact are insufficient to support any of the grounds which the tribunal determined to exist in order to terminate respondent-mother's parental rights under N.C.G.S. § 7B-1111(a). She characterizes the trial court's findings as "scant" and "unsupported" by the evidence.

¶ 23    We recognize that some of the findings of fact rendered in the trial court's order are not artfully worded in some instances and are not ideally sturdy in other instances. Several of the trial court's findings, for example, merely "recite[ ] the testimony of various witnesses rather than indicating what actually happened" and

---

[10] We note that the trial court orally admitted Exhibit K1 only "for illustrative purposes . . . to illustrate [the social worker's] testimony" and not as substantive evidence. *See generally State v. Gibbons*, 303 N.C. 484, 486 (1981) (distinguishing between illustrative and substantive evidence). In light of the trial court's written ruling, we decline to consider respondent-mother's suggestion that a text-based chronology of events cannot constitute illustrative evidence.

therefore are not constructed as findings of fact in the customary manner. *In re A.C.*, 378 N.C. 377, 2021-NCSC-91, ¶ 12. In assessing the properness and sufficiency of the trial court's order as a whole, however, we determine that the totality of the trial court's adjudicatory findings is enough to establish the existence of grounds for the termination of respondent-mother's parental rights under N.C.G.S. § 7B-1111(a)(1) based upon her neglect of the children.

¶ 24     Under N.C.G.S. § 7B-1111(a)(1), the trial court may terminate parental rights if "[t]he parent has . . . neglected the juvenile." A juvenile is deemed to be neglected if the juvenile does not receive proper care, supervision, or discipline from his or her parent or if the parent creates or allows to be created an environment injurious to the juvenile's welfare. N.C.G.S. § 7B-101(15) (2021). When a child has been out of the parent's custody for a significant period of time by the point at which the termination proceeding occurs, neglect may be established by a showing that the child was neglected on a previous occasion and the presence of the likelihood of future neglect by the parent if the child were to be returned to the parent's care. *In re J.R.F.*, 380 N.C. 43, 2022-NCSC-5, ¶ 11.

> Evidence of neglect by a parent prior to losing custody of a child — including an adjudication of such neglect — is admissible in subsequent proceedings to terminate parental rights, but the trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect. The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at*

*the time of the termination proceeding.*

*Id.* (extraneity omitted).

The trial court made the following findings of fact which were pertinent to its adjudication:

> 6. That a Juvenile Petition and Non-Secure Custody Order were entered on December 7, 2018, alleging that [Johnny, Janelle, and Joel] are neglected juveniles in that the juveniles did not receive proper care, supervision or discipline from the juvenile's parent, guardian, custodian or caretaker and the children lived in an environment injurious to the juvenile's welfare.
>
> 7. On April 4, 2019, the [c]ourt adjudicated the children . . . neglected juveniles pursuant to N.C.G.S. [§] 7B-101(15).
>
> 8. The [c]ourt takes judicial notice of the underlying Juvenile File . . . and [DSS's] efforts to work with [the parents]. The [c]ourt takes particular notice of the adjudication order and subsequent permanency planning hearings orders.
>
> 9. The [c]ourt carefully considered the Family Services Case Plan (FSCP). It appears that [respondent-mother] entered into that plan in December 2018 and signed that plan in January 2019. This FSCP consisted of mental health treatment and follow all recommendations, substance abuse treatment and follow all recommendations along with random drug screens, complete parenting classes, obtain and maintain stable housing and employment.
>
>       . . . .
>
> 11. *Social Worker Supervisor Vanessa McKnight testified about . . . [the parents'] noncompliance in their FSCP.*

. . . .

13. *Social Worker Rolanda Collins testified about her involvement in the case and . . . that the parents were non compliant with their FSCP.* As of the date of the hearing, [the parents] had obtained housing and completed parenting classes. However, as of the date of the hearing, random drug screens were not provided to [DSS] and mental health treatment [sic].

14. *Social Worker Rolanda Collins also testified that she made requests of the parents to submit to random drug screens on November 10, 2020, attempted a home visit to ask the parents on January 11, 2021, sent a text message on January 12, 2021, attempted a home visit on January 13 and 14, 2021.*

. . . .

16. The [c]ourt noted through testimony of Dr. [Sharon] Halliday, that [respondent-mother] received medication management services but no therapy services from July, 2019 through June, 2020.

17. [Respondent-mother] received substance abuse services from Rapha Clinic from June, 2020 until March, 2021 and her substance abuse treatment is ongoing.

18. Through the testimony of Dr. Halliday and the drug screen exhibits, [respondent-mother] tested positive for Cocaine in July 2020, Amphetamine October 2020 and Oxycodone March 2021.

19. *That Dr. Halliday indicated through her testimony that* [*respondent-mother*] *was going weekly to see the Provider for prescriptions and bi-weekly for drug screens during July 2020 until March 2021.* However, during this time, [respondent-mother] would refuse to submit random drug screens for [DSS]. [Respondent-mother] knew what days she would be going to the

Rapha Clinic and when she was going to submit to a drug screen. This did not comply with the random drug screen component of her FSCP.

20. *Social Worker Carolyn Collins testified that* [*DSS*] *received a referral based on the birth of* [*respondent-mother's*] *new baby,* [*Renee*] *in May 2020 and the medical records associated with that minor child.* Testimony and medical records showed that the minor child was born positive for Cocaine and had "withdrawals" from this illicit substance. [Respondent-mother] told Social Worker Collins that she had taken a [X]anax during her pregnancy with the minor child [Renee].

21. That the [c]ourt relies on and accepts into evidence an Affidavit with Medical Records regarding the sibling [Renee], in making these findings and finds the said report to both [sic] credible and reliable.

22. That [respondent-mother] nor [the father] has not made reasonable progress in this case considering that the FSCP has been in place since 2018 and there is a continued concern for their substance abuse treatment along with random drug screens, and mental health treatment. [*The father*] *states he has obtained employment but* [*respondent-mother*] *has not.*

23. *Caretaker* [*grandfather*] *testified that the parents' visitation was sporadic.* The parents visited at a birthday party recently *and before that,* [*the grandfather*] *could not recall visitation between the parents and the minor children.*

24. *Caretaker* [*grandfather*] *testified that the parents have bought some toys and a cellphone for the minor children in the past but that* [*respondent-mother*] *and* [*the father*] *have not provided any financial support for the care of the minor children while the minor children have been in his home since 2018.*

(Emphasis added.) The italicized portions of these findings are mere recitations of witness testimony rather than affirmative findings of fact. *In re D.T.H.*, 378 N.C. 576, 2021-NCSC-106, ¶ 15 (concluding that when a finding "consist[s] of nothing more than a recitation of respondent-father's testimony, it is not, in actuality, a finding of fact at all."). Therefore, we disregard the trial court's recitations of testimony which were denoted as findings of fact as we review the trial court's adjudication. *See id.* ¶ 8 (citing *In re N.D.A.*, 373 N.C. 71, 75 (2019)).

¶ 26        Respondent-mother challenges Findings of Fact 16 and 17 as presenting an incomplete and "glaringly inaccurate" picture of the evidence of treatment services that she received during the course of the case. Specifically, respondent-mother contends that these findings by the trial court fail to acknowledge Dr. Halliday's testimony that respondent-mother (1) received mental health and substance abuse treatment at RAPHA from January 2019 to May 2019; (2) received additional mental health treatment at RAPHA beginning in January 2020 and continuing at least into June 2020 and possibly into March 2021; and (3) reported to Dr. Halliday that she was receiving substance abuse services from a facility other than RAPHA between February 2020 and June 2020. Respondent-mother argues that Findings of Fact 16 and 17 reflect the trial court's larger failure to make *any findings* about her mental health treatment and "grossly distort the relevant testimony from [ ]DSS's own witness."

¶ 27     At the termination of parental rights hearing, Dr. Halliday testified that respondent-mother attended mental health therapy sessions at RAPHA from 30 January 2019 to 29 July 2019. Sessions at the facility were held once a month; respondent-mother would attend every other month. As for respondent-mother's utilization of services thereafter, Dr. Halliday testified as follows:

> A.     When she came back in February, 2020, she did not enter (inaudible) the program. She said she only wanted to access mental health services, so between January of 2020 to June of 2020, she only accessed mental health services, and then in June of 2020, she decided to resume the substance abuse program.
>
> Q.     Okay. So . . . from July of 2019 until maybe January of 2020, there was no substance abuse treatment that was being given to [respondent-mother] through your Rapha Clinic. Correct?
>
> A.     . . . [Y]es, from . . . July of 2019 to June of 2020.
>
> Q.     Okay.
>
> A.     She accessed substance abuse clinic because when she came back, she said she was going to another clinic for substance abuse at some time between then. I'm not sure when.
>
> Q.     Okay.
>
> A.     But she started going for substance [sic] between January to July. She stopped in July in 2019 and when she came back in January, she came back in the — (inaudible) she only came back for the meds she was on [for] substance abuse treatment.
>
> Q.     Okay. Was there —

A. And . . . in June of 2020 she said that she would resume our sessions (inaudible) services at the clinic.

¶ 28 We ascertain that Findings of Fact 16 and 17 provide an accurate account of the evidence regarding the narrow range of facts which were addressed in these disputed findings. While we agree with respondent-mother that the findings do not mention Dr. Halliday's testimony concerning respondent-mother's court-ordered participation in mental health treatment, nonetheless "[t]he trial court is not . . . 'required to make findings of fact on all the evidence presented, nor state every option it considered.'" *In re I.E.M.*, 379 N.C. 221, 2021-NCSC-133, ¶ 13 (quoting *In re E.S.*, 378 N.C. 8, 2021-NCSC-72, ¶ 22). In reviewing other findings of fact related to Findings of Fact 16 and 17 which appear in the trial court's order, the forum expressly cited its "continued concern" about the parents' mental health treatment in Finding of Fact 22 and elected to formulate its sound findings of fact which addressed the subject in this permissible way.

¶ 29 Similarly, Findings of Fact 16 and 17 do not expressly address the evidence of the treatment that respondent-mother received between January and June of 2019. However, this time period predates the initial adjudication and disposition orders entered by the trial court in July 2019 and was approximately two years before the termination hearing. Lastly, regarding these two findings of fact, as for Dr. Halliday's testimony that respondent-mother claimed to receive substance abuse treatment

from a source other than RAPHA for an indeterminate period between July 2019 and June 2020, the trial court was not obliged to make a specific finding based on this report of treatment which Dr. Halliday could not confirm or describe, and about which she did not have first-hand knowledge. The trial court was not required to make findings of fact regarding each item of evidence.

¶ 30    Respondent-mother challenges Finding of Fact 18, which describes her positive drug screens, as unsupported by the evidence. A review of the transcript of the termination hearing illustrates that this finding is supported in part and unsupported in part. Although respondent-mother protests the trial court's reliance in Finding of Fact 18 upon "drug screen exhibits", we have already determined that the trial court's consideration of Exhibit P—respondent-mother's drug screens from RAPHA—was proper since the exhibit was part of the juvenile case file. Further, Dr. Halliday testified that respondent-mother tested positive for cocaine on 7 July 2020 and tested positive for oxycodone on 4 January 2021 and 1 February 2021.[11] We shall disregard the March 2021 drug screen date[12] mentioned in Finding of Fact 18 as unsupported by the record and shall recognize as supported by the record the trial court's finding with regard to respondent-mother's positive drug screens for cocaine

---

[11] Finding of Fact 18 makes no mention of respondent-mother's positive screen for methamphetamine and MDMA on 7 December 2020, which is included in Exhibit P.

[12] Dr. Halliday testified that she had *a conversation* with respondent-mother in March 2021 about respondent-mother's two positive screens for oxycodone in January and February. This testimony would appear to explain the trial court's error in Finding of Fact 18.

and oxycodone. *Cf. In re S.M.*, 380 N.C. 788, 2022-NCSC-42, ¶ 24 ("[D]isregard[ing] the extra month included in this finding for purposes of our review.").

¶ 31          Also in her testimony, Dr. Halliday confirmed respondent-mother's positive drug screen for amphetamine on 26 October 2020, but explained that this result did not represent illicit drug use because respondent-mother was prescribed Adderall. *See generally State v. Ward*, 364 N.C. 133, 138 nn.2–3 (2010) (noting that Adderall contains amphetamine, a Schedule II controlled substance). Consequently, we shall disregard this portion of Finding of Fact 18 regarding the presence of amphetamine in respondent-mother's system which, though accurate, does not reflect the tenor of Finding of Fact 18 concerning respondent-mother's positive drug screens which resulted from her illegal use of controlled substances.

¶ 32          Having reviewed each of the trial court's findings of fact which are contested by respondent-mother, this Court addresses her sequential argument that the trial court's findings do not support the tribunal's determinations under N.C.G.S. § 7B-1111(a)(1). Based on its findings of fact, the trial court concluded as follows:

> 4.   That grounds exist based on clear, cogent and convincing evidence, to terminate the parental rights of the Respondent mother . . . pursuant to North Carolina General Statute[ ] 7B-1111 in that:
>
>      . . . .
>
>      b. That Respondent mother . . . ha[s] neglected the minor children in that there was past neglect, as evidenced by the prior adjudication order in the JA

> files, there is no evidence of changed circumstances of the [sic] and there is a likelihood of future neglect and a likelihood of repetition of neglect[.]

*See generally In re Ballard*, 311 N.C. 708, 715 (1984) (establishing the "prior neglect and the probability of a repetition of neglect" framework for adjudication); *accord In re J.R.F.*, ¶ 11. Respondent-mother contends that the trial court's findings of fact fail to establish either her prior neglect of the children before they were removed from her custody by DSS in December 2018 or a probability of future neglect if the children were returned to her custody. Based on our own examination of the trial court's findings and the applicable law, we disagree.

¶ 33   On the issue of prior neglect, respondent-mother asserts that "the court made no findings whatsoever addressing past neglect. The *only* effort that the court appears to have made towards addressing past neglect was to acknowledge the existence of the underlying 2019 neglect adjudication order" in Finding of Fact 8. Respondent-mother argues that the entry of the 2019 adjudication order "stands for one thing: the children were adjudicated to be 'neglected juveniles' " and does not satisfy the requirement of N.C.G.S. § 7B-1111(a)(1) that "[r]espondent-[m]other *herself* had neglected [the] children in the past." She further asserts that the 2019 adjudication order lacks any substantive findings that would support an adjudication of neglect and instead only lists a series of alleged events about which a DSS social worker "was informed" by various sources.

¶ 34        We find no merit in respondent-mother's creative depiction. It is well established that a prior adjudication of neglect is sufficient to establish prior neglect for purposes of N.C.G.S. § 7B-1111(a)(1). *In re C.S.*, 380 N.C. 709, 2022-NCSC-33, ¶ 16 ("[E]vidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights" (quoting *In re Ballard*, 311 N.C. at 715)). Moreover, this Court has "clarified that '[i]t is . . . not necessary that the parent whose rights are subject to termination be responsible for the prior adjudication of neglect.'" *Id.* (alterations in original) (quoting *In re J.M.J.-J.*, 374 N.C. 553, 565 (2020)).

¶ 35        In Findings of Fact 6 through 8, the trial court discussed the juvenile petition filed by DSS in 2018 which alleged that Johnny, Janelle, and Joel were neglected in that they did not receive proper care, supervision, or discipline from their parent or caretaker and lived in an injurious environment; the trial court found that the children were adjudicated to be neglected on 4 April 2019; and the trial court took judicial notice of the juvenile case file, including the adjudication order. These findings suffice to establish prior neglect. *See id.*

¶ 36        Equally unavailing is respondent-mother's contention that the 2019 adjudication order lacked proper findings to support the prior adjudication of neglect. Respondent-mother "did not appeal from the trial court's adjudication order. Therefore, [she] is bound by the doctrine of collateral estoppel from re-litigating these

findings of fact." *In re T.N.H.*, 372 N.C. at 409 (citing *King v. Grindstaff*, 284 N.C. 348, 356 (1973)). The trial court's findings in the 2019 adjudication order show that respondent-mother's ongoing substance abuse was the cause of her children's prior judicial adjudication as neglected juveniles.

¶ 37    Respondent-mother further argues that the trial court's findings of fact fall short of supporting its conclusion that there is a "likelihood of future neglect" if the children were returned to her custody. In characterizing this case as a matter in which "the 'likelihood of future neglect' is based entirely on [her] case plan noncompliance[,]" respondent-mother incorporates by reference the arguments in her brief which challenge the trial court's conclusion that she willfully failed to make reasonable progress under N.C.G.S. § 7B-1111(a)(2).

¶ 38    Respondent-mother reiterates assertions that she advanced regarding her perceived shortcomings of the trial court's findings of fact in her dispute of the forum's determination of the existence of grounds to terminate her parental rights. She maintains that the trial court failed to make any findings about her pursuit of mental health treatment, other than to express its "continued concern" about the issue. Respondent-mother reprises her stance that the trial court's "scant findings" do not allow for a valid assessment of whether her progress through substance abuse treatment was reasonable under the circumstances. Respondent-mother also submits that the trial court did not make any findings of fact about her "many recent negative

[drug] screens" which were introduced at the termination of parental rights hearing, about the severity of her substance abuse diagnosis, or about the significance of her occasional illicit drug use during her course of treatment. In light of these claimed omissions, respondent-mother argues that the trial court failed to enter a "proper order" allowing for effective appellate review. On the other hand, she emphasizes the favorable finding of fact in the trial court's order that she "had obtained housing and completed parenting classes" as required by her case plan.

¶ 39    Respondent-mother's effort to persuasively identify the legal inadequacy of the trial court's conclusion about the likelihood of future neglect because the determination was "based entirely on [her] case plan noncompliance" is not supported by this Court's own directives. "A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect. At the same time, a parent's compliance with his or her case plan does not preclude a finding of neglect." *In re A.N.H.*, 381 N.C. 30, 2022-NCSC-47, ¶ 40 (extraneity omitted). Our inquiry under N.C.G.S. § 7B-1111(a)(1) thus does not constitute an inventory of respondent-mother's itemized attainments of the various components of her case plan. It is also distinct from the question of whether she willfully failed to make reasonable progress under the circumstances to correct the conditions which led to the removal of her children under N.C.G.S. § 7B-1111(a)(2).

¶ 40    In this case, the children's prior adjudication of neglect in 2019 was entirely

based on incidents and circumstances arising from respondent-mother's long history of substance abuse. No other factors were mentioned in the adjudication order entered on 16 July 2019.

¶ 41   The findings of fact included in the termination order—specifically, the valid portions of Findings of Fact 13 and 16 through 21—show that respondent-mother had failed to resolve her substance abuse issues to a degree that would allow her to reliably care for Johnny, Janelle, and Joel. Despite intervals of treatment, respondent-mother continued to use illicit substances, even during her pregnancy with her daughter Renee, resulting in the child Renee being born in May 2020 with cocaine in her system, thus forcing the infant to go through symptoms of withdrawal. Even at the time of the termination of parental rights hearing, respondent-mother had recently tested positive for the opioid oxycodone despite receiving buprenorphine and gabapentin as part of her ongoing substance abuse treatment at RAPHA.

¶ 42   The findings of fact contained in the trial court's order also demonstrate respondent-mother's periodic refusal throughout the pendency of the case to submit to random drug screens requested by DSS as required by her case plan. Respondent-mother's ongoing substance abuse issues which continued to cast doubt upon her ability to responsibly parent the juveniles are further noted in the trial court's Finding of Fact 19, as the trial court determined that respondent-mother's positive drug screens were obtained even though she "knew what days she would be going to

the Rapha Clinic and when she was going to submit to a drug screen."[13]

¶ 43        Respondent-mother also faults the trial court for declining to include any findings of fact based upon her evidence of negative drug screens between 23 March 2021 and 11 May 2021 at Integrity Wellness Center, a treatment clinic for opiate dependence. However, these drug screens were administered when respondent-mother began her involvement with the center on 23 March 2021 and they continued to be predictably rendered at her subsequent weekly scheduled appointments. Therefore, these drug screens were not the type of random drug screens which were required by respondent-mother's case plan, and hence they did not measure respondent-mother's compliance with the same degree of enforcement and oversight.[14] Furthermore, the trial court's Findings of Fact 16, 17, and 19 credit respondent-mother's participation in medication management and other substance abuse treatment at RAPHA between July 2019 and March 2021, and acknowledge that "her substance abuse treatment [was] ongoing" at the time of the hearing. As we

---

[13] Social Worker Collins testified that respondent-mother "would go to the Rapha Center on a specific day of the week . . . to pick up her medications and may have a drug screen, may not, so that's why we wanted a random [screen]." Respondent-mother argues that drug screening at RAPHA incorporated "a degree of randomness" in that she was not tested every time she went to the clinic for her medications. However, respondent-mother knew in advance the specific day and time that she would be going to RAPHA and might be subject to screening. As Social Worker Collins testified, "[DSS] does not look at that as a random drug screen."

[14] Rodney Taylor, the clinical director of Integrity Wellness Center, testified that he considered the 23 March 2021 drug screen to be random because it was administered the day that respondent-mother first "came in as a new patient."

earlier observed, the trial court is not required in its findings of fact to catalog each of respondent-mother's negative drug screens during her treatment.[15] *See generally In re I.E.M.*, 379 N.C. 221, 2021-NCSC-133, ¶ 13 (providing that the trial court need not enter findings on each piece of evidence presented).

¶ 44        We hold that the trial court's findings of respondent-mother's continued substance abuse—including her use of controlled substances in a manner harmful to her daughter Renee during the time approaching the birth of the child—combined with her refusal to regularly comply with her case plan's requirement to submit to random drug screens so as to support the trial court's conclusion pursuant to N.C.G.S. § 7B-1111(a)(1) that respondent-mother was likely to subject Johnny, Janelle, and Joel to further neglect if these three juveniles were returned to her custody. While we recognize that the trial court did not address in its findings of fact all facets of respondent-mother's case plan, including such issues as respondent-mother's visitation with the children and her contribution to the children's cost of care, nonetheless in light of the circumstances leading to the children's prior adjudication of neglect in 2019 and respondent-mother's pervasive longstanding issue with substance abuse, the trial court's order is sufficient to demonstrate that there is a

---

[15] We note that respondent-mother's drug screen from 11 May 2021 registered positive for a metabolite of naloxone, a medication given to reverse an opioid overdose, in addition to buprenorphine, gabapentin, and amphetamine. *Naloxone*, Substance Abuse and Mental Health Servs. Admin., https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions/naloxone (last updated Apr. 21, 2022).

likelihood of further neglect if Johnny, Janelle, and Joel were returned to her custody. *See In re M.S.L.*, 380 N.C. 778, 2022-NCSC-41, ¶ 21; *In re A.S.T.*, 375 N.C. 547, 555 (2020) ("The trial court's findings of fact show that [the juvenile] was adjudicated to be a neglected juvenile due to the substance abuse issues of both respondent and the mother. Respondent has failed to appreciably address his substance abuse issues."); *see also In re M.Y.P.*, 378 N.C. 667, 2021-NCSC-113, ¶ 20 ("[S]ubstance abuse was also identified as an area of need for services, and the trial court could properly conclude that failure to address this issue could lead to a repetition of neglect.").

¶ 45    We are not persuaded by respondent-mother's challenge to the trial court's statement in its conclusion of law that "there is no evidence of changed circumstances." The trial court's findings of fact indicate that it considered respondent-mother's participation in substance abuse treatment as well as her achievements of completing parenting classes and obtaining permanent housing with the father. We are satisfied that the trial court used the phrase "changed circumstances" in the context of the appearance or realization of new conditions which came into existence to either cure or ameliorate the causes of the prior neglect. *See, e.g., In re J.R.F.*, 380 N.C. 43, 2022-NCSC-5, ¶ 11. The trial court did not err in concluding that the developments cited by respondent-mother were not sufficiently significant to obviate the likelihood of further neglect in this case.

¶ 46    Because we affirm the trial court's adjudication under N.C.G.S. § 7B-

1111(a)(1), we do not consider respondent-mother's arguments which contest the trial court's determinations under N.C.G.S. § 7B-1111(a)(2) and (3). *In re J.I.G.*, 380 N.C. 747, 2022-NCSC-38, ¶ 8.

## C. Cumulative error

In her remaining argument on appeal, respondent-mother asserts that the trial court's "many errors, even if harmless in isolation, cumulatively deprived [her] of her due process right to a fundamentally fair proceeding." She seeks to invoke the principle of "cumulative error" which this Court has applied on rare occasions when reviewing a criminal conviction. Under this doctrine, "[c]umulative errors lead to reversal when 'taken as a whole' they 'deprived [the] defendant of his due process right to a fair trial free from prejudicial error.' " *State v. Wilkerson*, 363 N.C. 382, 426 (2009) (second alteration in original) (quoting *State v. Canady*, 355 N.C. 242, 254 (2002)).

As respondent-mother concedes, we have not previously recognized the theory of cumulative error in a termination of parental rights proceeding or in civil cases generally. She cites the Court of Appeals opinion in *Maldjian v. Bloomquist*, 275 N.C. App. 103 (2020), as "signal[ing] that review for cumulative error is appropriate in a civil context." The lower appellate court in *Maldjian* merely determined that "the trial court's rulings cannot cumulatively be deemed prejudicial error" because they were not individually erroneous. *Id.* at 125. Nowhere in the *Maldjian* opinion—a

pronouncement which is illuminating rather than controlling authority when presented to this Court—appears an indication that civil cases are eligible for cumulative error analysis as a matter of course. This Court is not inclined to expand this scarcely utilized doctrine, which emanates from considerations spawned by the protections of criminal law, to this termination of parental rights matter. Having carefully reviewed each of respondent-mother's vigorous challenges to the trial court's evidentiary rulings and its findings of fact, we are satisfied that respondent-mother has not been deprived of her constitutional right to due process and a fundamentally fair proceeding. The trial court entered a written order explaining its decision with sufficient substance to allow this Court to undertake meaningful appellate review. Accordingly, respondent-mother's cumulative error argument is unpersuasive.

## III. Conclusion

We conclude that the trial court properly exercised subject matter jurisdiction in this case pursuant to N.C.G.S. § 7B-1101. We further hold that the trial court did not err in determining the existence of grounds to terminate respondent-mother's parental rights to the juveniles Johnny, Janelle, and Joel under N.C.G.S. § 7B-1111(a)(1) on the basis that the children were neglected juveniles and would likely suffer further neglect if returned to respondent-mother's care. The termination of parental rights order is hereby affirmed.

AFFIRMED.